# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE APR 1 7 2014



for CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Apr. 17 2014



Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| ROSS WILKINSON and CINDY WILKINSON; MONTE KARNES and KIMBERLY KARNES; DAVID BETHEL and JEANIE BETHEL; DARRELL McLEAN; JIM PAULUS and KATHY PAULUS; JUSTIN HARGIS and TABITHA HARGIS, JOE HARGIS and LINDA HARGIS; DANIEL MacINDOE and ISIDRA MacINDOE; DAVID SPICER and MARTHA SPICER, TED TREPANIER and RUBY AKINS-TREPANIER, | NO. 86870-1 |
|  | EN BANC |
| Respondents, |  |
| v. | Filed APR 1 7 2014 |
| CHIWAWA COMMUNITIES ASSOCIATION, a Washington Non-Profit corporation, |  |
| Appellant. |  |

STEPHENS, J.—Chiwawa Communities Association (Association) appeals the trial court's grant of summary judgment to owners of homes in the Chiwawa River Pines community. Respondents Ross and Cindy Wilkinson et al. asked the trial court to invalidate a 2011 amendment to the community covenants prohibiting

rental of their homes for less than 30 days. We must decide if short-term vacation rentals conflict with the covenants in place prior to 2011, if the Association validly amended the covenants to prohibit them, and if the trial court erred by striking portions of the offered evidence. We hold short-term rentals do not violate the covenants barring commercial use of the property or restricting lots to single-family residential use. We also hold the Association exceeded its power to amend the covenants when it prohibited short-term vacation rentals in 2011, and the trial court did not err by granting in part motions brought by the Wilkinsons to strike evidence. Accordingly, we affirm the trial court.[1]

## FACTS

Chiwawa River Pines (Chiwawa) is a planned residential community located in Chelan County. Clerk's Papers (CP) at 54-55. The community comprises of a mix of permanent and vacation residents. CP at 134.

As developer Pope & Talbot Inc. completed each of the development's six phases, it recorded a separate set of covenants that purported to establish a "general

---

[1] The dissent complains that by affirming the trial court as to the limited decisions the Association asked us to review we have somehow affirmed the trial court's order in its entirety. Dissent (Gordon McCloud, J.) at 2-3. This is simply not true. Although the Association assigned error to the trial court's order granting summary judgment to the respondent homeowners, the Association *did not* take issue with every ruling made therein. Br. of Appellant at 3-4. Rather, the Association asked us to consider whether short-term vacation rentals are consistent with the governing restrictive covenants of the Chiwawa River Pines community, whether a majority of Chiwawa homeowners could amend the governing restrictive covenants to prohibit short-term vacation rentals, and whether the testimony of certain Chiwawa homeowners and the comments of other homeowners in response to a 2007 survey were admissible evidence. *See id.* Our holding is consequently limited to these issues and the trial court's corresponding decisions. RAP 12.1(a) ("[T]he appellate court will decide a case only on the basis of issues set forth by the parties in their briefs.").

plan of development" for the community. *See, e.g.*, CP at 55. Under the Pope & Talbot covenants, ownership of the property in Chiwawa automatically carries a right of membership in the Association. CP at 63, 67, 72, 75, 78. In 1988, a majority of the Association's members voted to consolidate the Pope & Talbot covenants into a single set of covenants governing all six phases of the development (1988 covenants). CP at 178, 186. The 1988 covenants preserved much from the earlier Pope & Talbot covenants, including the right of membership in the Association for all landowners, CP at 84, and the power "to change these protective restrictions and covenants in whole or in part" by majority vote, CP at 83. The 1988 covenants also carried over earlier restrictions on construction and land use from phases three through six, CP at 55-57, and restrictions on signage from phase two, *compare* CP at 63-64, *with* CP at 82. In 1992, the Association voted to eliminate the clause permitting construction of "one guest cottage" on Chiwawa lots, *compare* CP at 81, *with* CP at 85, but made no other material amendments. Thus, the resultant 1988/1992 covenants provide in pertinent part:

> 4. LAND USE.
> Lots shall be utilized solely for *single family residential use consisting of single residential dwelling* and such out-buildings (garage, patio structure), as consistent with permanent or recreational residence. All habitable structures must be located not nearer than 20 feet to the front lot line. Structures shall be of new construction and shall not be commenced until building permit of appropriate public body is obtained. . . .
> 5. NUISANCE OR OFFENSIVE USE.
> No nuisance or offensive use shall be conducted or suffered as to lots subject hereto, *nor shall any lot be utilized for industrial or commercial use* (excepting only appropriate real estate sale signs in sale of lots, grantor further reserving to itself, its successors and assigns, the right to operate a conventional real estate sales or agency office upon an unsold lot within such plat), nor as a dump, nor shall there be kept animals or stock of any kind

-3-

other than conventional, domestic pets with the exception of horses, etc. stabled on the lot for short-term recreational activities complying with non-road usage in Chiwawa River Pines, except for entrance and exit. Lot owners retaining animals must confine their animals from wandering off the lot and must maintain cleanliness of grounds to eliminate animal offensive wastes, odors, flies, etc. at all times. . . .

6. TRASH DISPOSAL.

. . . No sign of any kind shall be displayed to the public view on any lot, tract or subdivision thereof in the plat, except one sign of not more than 3 feet square giving the names of the occupants of the lot, tract, or approved subdivision thereof, and *one sign of not more than 6 square feet advertising the property for sale or rent.*

CP at 85-86 (emphasis added). The 1988/1992 covenants remained unchanged until the Association sought to amend them in 2008 and again in 2011 to prohibit short-term rentals.

Chiwawa residents have rented their homes to unrelated persons on a short-term, for-profit basis for decades without controversy.[2] CP at 59. However, as the number of homes available for short-term rental and the frequency of rentals increased, the Association noted rising concerns among members about vacation rentals. CP at 655, 689.

In response to member complaints, in 2007 the Association distributed a survey to gauge interest in barring what it characterized as "nightly rentals." CP at 135. A majority favored such a prohibition and, in September 2008, voted to bar all rentals of less than six months as prohibited commercial uses. CP at 135-36.

In a predecessor case, Ross and Cindy Wilkinson and other homeowners (collectively Wilkinsons) successfully challenged the 2008 amendment in superior

---

[2] The court notes that there were instances when the Association sought to terminate "lodging facilities and transient nightly rentals," Br. of Appellant at 6, but not weekend, weekly, or monthly rentals.

court. *Wilkinson v. Chiwawa Cmtys. Ass'n*, noted at 162 Wn. App. 1005, 2011 Wash. App. LEXIS 1336, at *1, *8. The trial court granted summary judgment in their favor, declaring the prohibition on rentals invalid and unenforceable. *Id.* at *8. The trial court also fashioned sua sponte a new covenant that barred rentals of less than one month in duration. *Id.* at *12. The Wilkinsons successfully appealed this judicial rewriting. *Id.* at *13-14. The Court of Appeals held that the trial court lacked authority to rewrite the covenants except on motion, and approved, in dicta, the trial court's invalidation of the 2008 amendment. *Id.* at *12-14. No review of the decision was sought in this court.

Shortly after the Court of Appeals issued its decision, a majority of the Association again voted to amend the covenants, this time to prohibit rentals "for less than one month[ or] 30 continuous days." CP at 160-61, 173, 175 (2011 amendment). The Wilkinsons again filed suit in superior court to invalidate the 2011 rental restriction. CP at 3, 60-61. Both sides moved for summary judgment, CP at 88, 442, and the Wilkinsons additionally moved to strike portions of the evidence offered by the Association in support of its motion, CP at 906-07, 1077-80.

The trial court granted the Wilkinsons' motion for summary judgment in full, holding the 2011 bar on short-term rentals invalid and unenforceable. CP at 1087-89; Verbatim Report of Proceedings (Dec. 15, 2011) (1 VRP) at 34-35. The court concluded that the Pope & Talbot and 1988/1992 covenants "contemplated that there could be rentals," and that "[t]here were no limitations on those rentals." 1 VRP at 34. The trial court granted the Wilkinsons' motion for summary judgment, holding

the 2011 amendment was invalid. 1 VRP at 35. The trial court rejected the Association's arguments that residential rentals of any duration are a "commercial" use of land and that renting a home to unrelated persons violates the single-family residential use covenant. *See* CP at 1087-89; 1 VRP at 35-37. The court also granted the Wilkinsons' evidentiary motions in part, striking comments from the 2007 member survey and portions of declarations by three Chiwawa residents. CP at 1101-02; 1 VRP at 35-36.

The Association sought direct review in this court under RAP 4.2(a)(3) and (4). *See* Statement of Grounds for Direct Review at 14. The Association argues that the trial court wrongly ruled that short-term vacation rentals are consistent with single-family residential uses, that a majority of Chiwawa homeowners cannot amend the governing covenants to prohibit short-term vacation rentals, and that the 2007 survey and testimony from several homeowners were inadmissible. Br. of Appellant at 13-15. This court accepted direct review. Order, No. 86870-1 (Wash. Oct. 9, 2012).

## ANALYSIS

We review a trial court's order on cross motions for summary judgment and related evidentiary rulings de novo. *Davis v. Baugh Indus. Contractors, Inc.*, 159 Wn.2d 413, 416, 150 P.3d 545 (2007) (citing *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998)). We will affirm the trial court's order granting summary judgment "if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Dowler v. Clover Park Sch. Dist.*

*No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011); CR 56(c). "Here, the parties largely agree[] on the material facts." Br. of Appellant at 15 n.7.

*I. Vacation Rentals Are Not Commercial Uses and Are Consistent with Single-Family Residential Use Provisions*

The Association argues that short-term vacation rentals are inconsistent with the governing restrictive covenants prohibiting commercial use and restricting lots to single family residential use. *See id.* at 13. We disagree.

Interpretation of a restrictive covenant presents a question of law. *Wimberly v. Caravello*, 136 Wn. App. 327, 336, 149 P.3d 402 (2006). We apply the rules of contract interpretation. *Id.* While Washington courts once strictly construed covenants in favor of the free use of land, we no longer apply this rule where the dispute is between homeowners who are jointly governed by the covenants. *Riss v. Angel*, 131 Wn.2d 612, 621-24, 934 P.2d 669 (1997). This change in approach was driven by the recognition that "'[s]ubdivision covenants tend to enhance, not inhibit, the efficient use of land.'" *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 816, 854 P.2d 1072 (1993) (quoting Robert D. Brussack, *Group Homes, Families, and Meaning in the Law of Subdivision Covenants*, 16 GA. L. REV. 33, 42 (1981); *see also Green v. Normandy Park Riviera Section Cmty. Club, Inc.*, 137 Wn. App. 665, 683, 151 P.3d 1038 (2007). Rather than place a thumb on the scales in favor of the free use of land, "[t]he court's goal is to ascertain and give effect to those purposes intended by the covenants." *Riss*, 131 Wn.2d at 623. Courts "place 'special emphasis on arriving at an interpretation that protects the homeowners'

collective interests.'" *Id.* at 623-24 (quoting *Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 181, 810 P.2d 27 (1991)).

Thus, our primary objective in contract interpretation is determining the drafter's intent. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 696, 974 P.2d 836 (1999); *Riss*, 131 Wn.2d at 623; *Mains Farm*, 121 Wn.2d at 815. "While interpretation of the covenant is a question of law, the drafter's intent is a question of fact." *Ross v. Bennett*, 148 Wn. App. 40, 49, 203 P.3d 383 (2009) (citing *Wimberly*, 136 Wn. App. at 336). "But where reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." *Id.* at 49-50 (citing *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 788, 108 P.3d 1220 (2005)). In determining the drafter's intent, we give covenant language "its ordinary and common use" and will not construe a term in such a way "so as to defeat the plain and obvious meaning." *Mains Farm*, 121 Wn.2d at 816; *Riss*, 131 Wn.2d at 623. We examine the language of the restrictive covenant and consider the instrument in its entirety. *Hollis*, 137 Wn.2d at 694 (quoting *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 344, 883 P.2d 1383 (1994)); *Wimberly*, 136 Wn. App. at 336. The lack of an express term with the inclusion of other similar terms is evidence of the drafters' intent. *See Burton v. Douglas County*, 65 Wn.2d 619, 622, 399 P.2d 68 (1965). "Extrinsic evidence is . . . used to illuminate what was written, not what was intended to be written." *Hollis*, 137 Wn.2d at 697. We, however, do not consider extrinsic "[e]vidence that would vary, contradict or modify the written word" or "show an intention independent of the instrument." *Id.* at 695.

As the text of the Chiwawa covenants demonstrates, the drafters included detailed provisions outlining what residents cannot do. From this it is evident that had the drafters wanted to prohibit rentals of a particular duration, they would have done so. The 1988/1992 covenants specify the rights and duties of Chiwawa residents in painstaking detail, spelling out, inter alia, the animals residents may keep, the minimum distance houses must be set back from the front lot line, the size of name signs residents may display, and their authority to bring enforcement actions. *See* CP at 81-82, 85-86. Most apparently, the drafters specifically anticipated and permitted rentals when they restricted the size of rental signs residents could hang. CP at 82, 86. Indeed, the limit on rental signage proves not just that the Pope & Talbot and 1988/1992 covenants allow some rentals but that the drafters anticipated rentals and consciously decided not to limit their duration, restricting just the appearance of rental signs.

The dissent argues that the restriction on rental signage merely establishes that the drafters intended to permit some rental activity and that it remains a question of fact to determine, based on extrinsic evidence, whether the drafters contemplated long-term or transient rentals, or both. Dissent (Gordon McCloud, J.) at 3-4, 6 n.6, 8. This argument misapprehends Washington law. While extrinsic evidence can be "used to illuminate what was written," *Hollis*, 137 Wn.2d at 697, it cannot be used to "show an intention independent of the instrument." *Id.* at 695. Had the covenants expressed a durational limitation, such as specifying long-term rentals, then extrinsic evidence would be admissible to elucidate the meaning of the word "long-term."

*See Bauman v. Turpen*, 139 Wn. App. 78, 90, 160 P.3d 1050 (2007) (permitting extrinsic evidence to clarify the meaning of the term "one story"); *Wimberly*, 136 Wn. App. at 331, 337 (permitting extrinsic evidence to clarify the phrase "simple, well-proportioned structures"); *Day v. Santorsola*, 118 Wn. App. 746, 750, 758, 76 P.3d 1190 (2003) (considering extrinsic evidence to determine whether a covenant that restricted homes to two stories addressed height as opposed to view). Such was the circumstance in all the cases that the dissent relies upon as support that we should admit extrinsic evidence in this instance. *See* dissent (Gordon McCloud, J.) at 8 n.8. Despite the dissent's belief, silence as to duration does not create ambiguity. *Id.* at 4. "'It is the duty of the court to declare the meaning of what is written, and not what was intended to be written.'" *Berg v. Hudesman*, 115 Wn.2d 657, 669, 801 P.2d 222 (1990) (quoting *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944)).

Based on the drafters' detailed discussion about what Chiwawa homeowners could not do, their clear expression that rentals were permissible uses, and the absence of any durational restriction on such rentals, reasonable minds could reach but one conclusion—that the drafters intended to permit rentals without any durational limitation. It was therefore proper for the trial court to determine the issue of the drafter's intent as a matter of law.

Not only is it manifestly clear that the drafters intended to permit vacation rentals without any durational limitation, such rentals are consistent with the prohibition on commercial use. If a vacation renter uses a home "for the purposes

of eating, sleeping, and other residential purposes," this use is residential, not commercial, no matter how short the rental duration. *Ross*, 148 Wn. App. at 51-52 (holding rental use was commercial not residential because such use "is identical to [the homeowner's] use of the property, as a residence, or the use made by a long-term tenant"). "The owner's receipt of rental income either from short- or long-term rentals in no way detracts or changes the residential characteristics of the use by the tenant." *Id.* at 51. Nor does the payment of business and occupation taxes or lodging taxes detract from the residential character of such use to make the use commercial in character. *See id.* (determining that "whether the short-term rental is subject to state tax does not alter the nature of the use").

The Association argues that we created in *Mains Farm* and reaffirmed in *Metzner v. Wojdyla*, 125 Wn.2d 445, 866 P.2d 154 (1994), "a bright line rule . . . that prohibits *any* commercial or business use of a property subject to a residential use restriction." Reply Br. of Appellant at 7-8. The Association reads these cases too broadly. In *Mains Farm*, "[w]e caution[ed] that the interpretation of a particular covenant is largely dependent upon the facts of the case at hand." 121 Wn.2d at 827. We held the operation of an adult family home violated a covenant restricting use to "'single family residential purposes only'" because it was "'more institutional in nature than . . . familial'"; "'[t]he single-family residential nature of defendant's use of her home [was] destroyed by the elements of commercialism and around-the-clock care.'" *Id.* at 813, 821 (emphasis omitted). Similarly, in *Metzner*, we held the operation of a child day care violated a provision requiring properties "'be used for

residential purposes only'" because it involved the exchange of money for care of persons unrelated to the homeowner. 125 Wn.2d at 447, 451 (emphasis omitted).

The Wilkinsons' short-term rental of their properties is distinguishable from the commercial uses in *Mains Farm* and *Metzner*. Both the operations in *Mains Farm* and *Metzner* provided some form of on-site service that the Wilkinsons do not provide to their guests. Thus, the Wilkinsons' short-term rentals do not, without more, violate the 1988/1992 covenant prohibiting commercial use.[3]

Nor does the 1988/1992 covenants' "single family residential use" restriction limit to whom vacation rentals may be rented. Reading the restriction, as the Association does, to prohibit unrelated persons from residing within Chiwawa would require us to read the provision out of context. The "single family, residential use" restriction is incorporated into a provision that restricts the type of structures that

---

[3] The dissent criticizes us and the trial court for relying on *Ross*, arguing that the *Ross* court "held only that a particular restrictive covenant limiting property use to 'residence purposes only' was consistent with short-term vacation rentals," and that this holding was based "on a highly fact-specific record." Dissent (Gordon McCloud, J.) at 7. But *every* case is rooted in its facts; the question is whether the relevant facts in *Ross* are different from the facts here. They are not. Just as in this case, the residents in *Ross* leased their homes to short-term renters and the homeowners' association argued that they were making commercial use of the land, rather than residential use. 148 Wn. App. at 51. The court held unequivocally that a residential renter, no matter how short the rental duration, does not violate a restrictive covenant requiring that "'[a]ll parcels within said property shall be used for residence purposes only and only one single family residence may be erected on each such parcel'" because that use is residential, not commercial. *Id.* at 44, 52 (alteration in original). The court explained that the single family residence restriction "merely restricts use of the property to residential purposes," *id.* at 52, which is consistent with a residential renter who uses a home "for the purposes of eating, sleeping, and other residential purposes," *id.*, because that use "is identical to [the homeowner's] use of the property, as a residence, or the use made by a long-term tenant." *Id.* at 51. The court was not concerned with whether the drafters intended to permit vacation rentals, which the dissent emphasizes, but with whether the vacation rentals constituted a prohibited commercial use. This was the case because extrinsic evidence cannot be used to "vary, contradict or modify the written word." *Hollis*, 137 Wn.2d at 695.

can be built and how far from the front line they must be built. Read in context, the single-family covenant restricts only the type and appearance of buildings that may be constructed on the lot, not who may reside there. This reading is preferred as it "protects the homeowners' collective interest" and is consistent with how other states interpret single-family covenants. *See generally* Mark S. Dennison, Annotation, *Construction and Application of "Residential Purposes Only" or Similar Covenant Restriction to Incidental Use of Dwelling for Business, Professional, or Other Purposes*, 1 A.L.R.6th § 5, at 135 (2005).

Moreover, reading the provision to prohibit unrelated persons from residing together would produce absurd results. Under the Association's reading, Chiwawa residents would violate their covenants whenever they host a sleepover for their children's playmates, share their homes with friends for a weekend, or cohabitate with a partner outside of marriage. We reject "forced or strained" interpretations of covenant language if they lead to absurd results. *Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 122, 118 P.3d 322 (2005).

We emphasize that our holding does not prohibit residential communities from prohibiting short-term rentals. We merely hold that the Chiwawa River Pines community did not do so through covenants allowing rentals while prohibiting commercial uses and limiting homes to single-family structures.

## II. A Simple Majority Sought To Deprive Chiwawa Landowners of Their Property Rights, Inconsistent with the General Plan of Development.

A prohibition on short-term rentals is unrelated to the 1988/1992 covenants and therefore cannot be adopted by a simple majority vote. We do not hold that homeowners can never limit the duration of rentals, as the dissent believes, just that a majority of Chiwawa homeowners cannot force a new restriction on a minority of unsuspecting Chiwawa homeowners unrelated to any existing covenant. Dissent (Gordon McCloud, J.) at 3. While Chiwawa homeowners knew that existing restrictive covenants could be *changed* by majority vote so long as the changes were consistent with the general plan, they did not buy into the creation of *new* restrictions unrelated to existing ones.

In Washington, the authority of a simple majority of homeowners to adopt new covenants or amend existing ones in order to place new restrictions on the use of private property is limited. When the governing covenants authorize a majority of homeowners to *create* new restrictions unrelated to existing ones, majority rule prevails "provided that such power is exercised in a reasonable manner consistent with the general plan of the development." *Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc.*, 76 Wn. App. 267, 273-74, 883 P.2d 1387 (1994). However, when the general plan of development permits a majority to *change* the covenants but not create new ones, a simple majority cannot add new restrictive covenants that are inconsistent with the general plan of development or have no relation to existing covenants. *See Ebel v. Fairwood Park II Homeowners' Ass'n*, 136 Wn. App. 787, 793, 150 P.3d 1163 (2007); *Meresse v. Stelma*, 100 Wn. App. 857, 865-66, 999 P.2d

1267 (2000); *Lakeland Prop. Owners Ass'n v. Larson*, 121 Ill. App. 3d 805, 459 N.E.2d 1164, 77 Ill. Dec. 68 (1984). This rule protects the reasonable, settled expectation of landowners by giving them the power to block "'new covenants which have no relation to existing ones'" and deprive them of their property rights. *Meresse*, 100 Wn. App. at 866 (emphasis omitted) (quoting *Lakeland*, 459 N.E.2d at 1167, 1169). As the Court of Appeals observed, "'[t]he law will not subject a minority of landowners to unlimited and unexpected restrictions on the use of their land.'" *Id.* (quoting *Boyles v. Hausmann*, 246 Neb. 181, 517 N.W.2d 610, 617 (1994)).

While we recognize, as does the dissent, that no Washington case has described the precise contours of when an amendment would be "consistent with the general plan of development," we need not provide that guidance here because the Chiwawa general plan did not authorize a majority of owners to adopt new covenants. The Chiwawa general plan of development merely authorized a majority of owners "to change these protective restrictions and covenants in whole or in part." CP at 83; *see Lakeland*, 459 N.E.2d at 1167, 1169 (interpreting a covenant that permitted changes to "'the said covenants in whole or in part'" as permitting changes "not the add[ition] of new covenants which have no relation to existing ones"); *see also Meresse*, 100 Wn. App. at 864-66 (emphasizing that its analysis of a covenant allowing a majority "'to change or alter [the covenants] in full or in part'" was in accord with *Lakeland*, which interpreted a similar provision as allowing changes but not the addition of new covenants unrelated to existing ones (emphasis omitted)).

Thus, for amendments by majority vote to be valid in Chiwawa, such amendments must be consistent with the general plan of development *and* related to an existing covenant.

As determined earlier, the Chiwawa general plan of development allows homeowners to rent their homes without any durational limitation. Homeowners who took title under these covenants were not on notice that short-term rentals might be prohibited without their consent. The Association defends its actions as consistent with the general plan because it did not ban *all* rentals, just *some* rentals. *See* Reply Br. of Appellant at 5. The Association, however, misses the distinction between contracts that permit *changes* to existing covenants by majority vote and those that allow the *creation* of new covenants by majority vote. In distinguishing between these types of contracts, we respect the expectation of the parties and the contract they entered. While it is true that in *Shafer*, the court upheld the adoption of new restrictions on outdoor storage of inoperative motor vehicles and commercial fishing, even though no such rule had previously existed, the court did so only because the dissenting homeowners "had notice of the reservation of power" that allowed the homeowner corporation to create new covenants that benefited the community. 76 Wn. App. at 270, 272, 277. The Chiwawa homeowners did not. We reject the Association's position in favor of protecting the reasonable and settled expectation of landowners in their property.

The dissent makes a similar mistake. The dissent contends that we must remand this case for a factual inquiry to determine whether the 2011 amendment

was "'consistent with the general plan of development'—by looking to 'the language of the covenants, their apparent import, and the surrounding facts'" as required by *Meresse*. Dissent (Gordon McCloud, J.) at 12, 14 (emphasis omitted) (internal quotation marks omitted) (quoting *Meresse*, 100 Wn. App. at 865). While it is true that when determining whether an amendment is consistent with the general plan of development we look to the language of the covenants, their apparent import, and the surrounding facts, the dissent misapprehends the inquiry at issue in *Meresse*. Unlike the covenants in *Shafer*, the covenants in *Meresse* did not allow a majority to create new covenants but only to change existing ones. 100 Wn. App. at 864-65. Thus, for the amendment in *Meresse* to be valid, it had to be both consistent with the general plan of development and related to an existing covenant. Accordingly, the homeowners argued that the amendment regarding the relocation of an access road was not a new wholesale restriction but rather a change to the preexisting "'road maintenance'" covenant regarding road "'construction'" and "'repair.'" *Id.* at 864. Consequently, the court's inquiry was whether the amendment was sufficiently related to the existing road maintenance covenant. The court ultimately determined it was not because the restriction imposing a duty on homeowners to remove obstructions "d[id] not place a purchaser or owner on notice that he or she might be burdened, without assent, by road relocation at the majority's whim." *Id.* at 866-67.

Like the covenants in *Meresse*, the Chiwawa covenants prohibiting nuisance or offensive uses or the display of excessive rental signs would not have placed Chiwawa homeowners on notice that short-term rentals would be prohibited. Thus,

the 2011 amendment was unrelated to any existing covenant. The Association could not adopt the restriction without unanimous consent. This is the contract into which the parties bought and the expectation that we must uphold.

*III. The 2007 Survey Comments and Testimony of Residents*
*Were Properly Excluded*

We also affirm the trial court's exclusion of the homeowners' comments in the 2007 survey and portions of the declarations of three Chiwawa residents: Judy Van Eyk, James Padden, and Gloria Fisk.

*a. 2007 Survey Comments*

The 2007 survey comments were inadmissible hearsay. *See Smith v. Sturm, Ruger & Co.*, 39 Wn. App. 740, 749, 695 P.2d 600 (1985) (surveying opinion-polling cases and noting survey answers given by interested parties describing past events "have consistently been held to be double hearsay"). The 2007 survey comments discussed homeowner support or rejection of the Association's proposed ban on nightly rentals and projections about the impact short-term rentals have had on the community. *See* CP at 153-57.

The Association does not dispute that the 2007 survey comments were hearsay but argues that they fall within the judge-made exception followed in *Simon v. Riblet Tramway Co.*, 8 Wn. App. 289, 505 P.2d 1291 (1973). Br. of Appellant at 35-36. This is incorrect. *Simon* rests on a hearsay exception fashioned in *Nordstrom v. White Metal Rolling & Stamping Corp.*, 75 Wn.2d 629, 632-34, 453 P.2d 619

(1969),[4] regarding the inherent trustworthiness and reliability of surveys compiled by disinterested authorities in published materials. In *Nordstrom*, this court held a published industry manual on the safety of ladders was admissible, although hearsay, because it was "produced by persons or groups having special knowledge regarding the subject under discussion, and having no motive to falsify, but having rather every reason to state the facts as they are known to the author or authors." *Id.* at 633. Similarly, in *Simon*, the National Society of Professional Engineers' survey of salaries among engineers was "trustworthy and reliable" because it was "published by a reputable society . . . without any apparent reason to falsify it." *Simon*, 8 Wn. App. at 294. In contrast, here, the 2007 survey comments were made by interested homeowners as part of a contentious vote over property rights and compiled by an organization that was interested in the outcome. As such, the comments do not have the hallmarks of inherently reliable evidence. We affirm the trial court's decision to strike these hearsay comments.

*b. Individual Residents' Declarations*

The trial court also properly struck various portions of declarations by Judy Van Eyk, James Padden, and Gloria Fisk. An affidavit supporting a motion for summary judgment "shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." CR 56(e). A lay witness may testify to

---

[4] Although both *Simon* and *Nordstrom* predate the adoption of Washington's Evidence Rules, they are based on principles "substantially in accord with" ER 803(a)(17), ROBERT H. ARONSON, THE LAW OF EVIDENCE IN WASH. § 803.02, at 803-8.1 (4th ed. 2012), which creates a hearsay exception for "[m]arket quotations, tabulations, lists, directories, or other published compilations generally used and relied upon by the public or by persons in particular occupations," *id.* at § 803.01, at 803-5.

her opinions and inferences, but this testimony must be "rationally based on the perception of the witness." ER 701.

The trial court properly excluded portions of Ms. Van Eyk's and Mr. Padden's declarations because they lacked personal knowledge. In her declaration, Ms. Van Eyk comments that homeowners who rent their residences "make more money renting weekends this time of year and do not want a full-time tenant," and states that that her long-term tenant had a friend that was willing to pay a premium for a three-month term rental, and opines that "[p]laintiffs' goal in this lawsuit is to protect their businesses and bottom line." CP at 1082-83. Mr. Padden's declaration similarly consists of opinions. Mr. Padden conjectures that "it was clear that the developer, Pope & Talbot, intended to create a community of single families," that in the early days of the development, "[n]o one . . . was renting" or "advertising their homes" or "had a commercial license for their rental businesses," that "[t]he community's focus was on providing an enjoyable refuge for families, not to provide an opportunity to make money," and that the current state of affairs "is not [what] the developer intended." CP at 1085-86. Neither the developers' intent, the activities of all other residents, the motivations of other Chiwawa homeowners, nor the desires of strangers to move into the community are within Ms. Van Eyk's or Mr. Padden's personal knowledge or perceptions. Therefore, the trial court correctly struck them.

The trial court also properly excluded Ms. Fisk's statement that the board had threatened enforcement action against a homeowner for renting out his property "for less than one month—the same type of activity at issue in this lawsuit." CP at 992.

Although Ms. Frisk, as the Association's then-president, had personal knowledge of the threatened action, her statement was false and misleading. The record shows that the Board sent this homeowner a letter advising him that *daily* rentals would violate the covenants, CP at 180, 221; *see Wilkinson*, 2011 LEXIS 1336, at *7, which is not "the same type of activity at issue in this lawsuit." CP at 992. The trial judge did not err by excluding Ms. Fisk's misleading statements.

## CONCLUSION

The trial court properly excluded inadmissible testimony offered by the Association and granted summary judgment in favor of the Wilkinsons. The covenants in effect before the 2011 amendment allowed Chiwawa homeowners to rent their homes without limitations on duration. Such short-term rentals do not violate the ban on commercial use or the requirement that structures be suitable for single-family residential use. Because a durational restriction on rentals would be inconsistent with the 1988/1992 covenants, it cannot be adopted by a simple majority vote of Chiwawa homeowners. Therefore, the 2011 amendment barring short-term rentals was invalid. We affirm.

_Stephens, J._

WE CONCUR:

_J.M. Johnson_

_Johnson_

_González, J._

_Fairhurst, J._

No. 86870-1

MADSEN, C.J. (dissenting)—The issue is whether the Chiwawa Communities Association (Association) validly amended the communities' restrictive covenants to prohibit the homeowners within the communities from renting their homes for less than 30 days at a time, short-term rentals. The majority decides as a matter of law that an existing restriction limiting the number and size of "for rent" signs that a resident may display on the property conclusively proves intent that rentals of any duration were consciously considered when the covenants were written. I cannot agree with this incredible supposition.

The majority also concludes as a matter of law that the covenants did not reserve authority to a majority of association members to ban rentals of under 30 days because this durational restriction is "unrelated" to any existing covenant. "Relatedness" to an existing covenant involves an artificial distinction between changes to restrictive covenants and creation of new restrictive covenants. Although some courts recognize the distinction, the better analysis is presented by courts that have wisely rejected it. This court should reject the distinction as well.

Both the question of what the existing covenants mean in regard to duration, if anything, and the question whether the covenants reserved power to a majority to impose a durational ban on rentals should be remanded so that the parties may submit extrinsic evidence, if any is available, to illuminate the meaning of the covenants.

## Discussion

The questions posed by this case are twofold: What, if anything, did the restrictive covenants say about renting property for short terms prior to adoption of the explicit ban on short-term rentals, and did the reservation of power provision in the covenants authorize a majority of homeowners to adopt the ban on short-term rentals.

The primary responsibility of a court when faced with a dispute about the meaning of restrictive covenants is to determine the intent of the parties who established the covenants. *Riss v. Angel*, 131 Wn.2d 612, 621, 934 P.2d 669 (1997). The court examines the language used as indicating the parties' intent, with the language given its ordinary and common meaning. *Id.*; *Metzner v. Wojdyla*, 125 Wn.2d 445, 450, 886 P.2d 154 (1994); *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 815, 854 P.2d 1072 (1993).[1]

---

[1] There is no rule that requires construing the restrictive covenants here favorably to the free use of land. By the time this court decided *Riss*, 131 Wn.2d 612, that rule had been either disregarded or questioned in a number of cases. In *Riss*, the court expressly held that in cases involving disputes "among homeowners in a subdivision governed by the restrictive covenants [the] rule[] of strict construction . . . in favor of the free use of land [is] inapplicable." *Riss*, 131 Wn.2d at 623. Headnote 7 (regional reporter) in *Viking Properties, Inc. v. Holm*, 118 P.3d 322 (2005), accordingly, is incorrect.

2

*Whether the existing covenants addressed duration of rentals*

The existing covenants recognized that property may be rented. A covenant restricting the number and size of "for rent" signs that homeowners may place on their property says in part:

> No sign of any kind shall be displayed to the public view on any lot, tract or subdivision thereof in the plat, except one sign of not more than 3 feet square giving the names of the occupants of the lot, tract, or approved subdivision thereof, and one sign of not more than 6 square feet advertising the property for sale or rent.

Clerk's Papers (CP) at 86.

This restriction begins with a general rule—no signs allowed—and then lists certain specific, detailed exceptions for signs of limited size and number. The obvious purpose is to prevent multiple or large signs and the immediate concern is also obvious—addressing the appearance (aesthetics) of the properties and the residential neighborhoods. This interpretation is fortified by the placement of the restrictive language in a covenant titled "TRASH DISPOSAL" that also provides that "[n]o trash, garbage, ashes or other refuse may be thrown, dumped, or otherwise disposed of on any lot, vacant or otherwise." *Id.* Plainly, the covenant is concerned primarily with property upkeep and appearance.

The restriction also implicitly acknowledges that home rentals may occur. On its face, however, this is all it does.

3

But, astonishingly, the majority concludes that the sign restriction "*proves . . .* that the drafters anticipated rentals and *consciously decided* not to limit their duration." Majority at 9 (emphasis added). The majority's reading is not consistent with the ordinary language used and is far from reasonable. The specific reference to "for rent" signs reflects the fact that both selling and renting homes are common occurrences in residential neighborhoods when homeowners decide not to live in their homes and predictably will place signs on their property to advertise its availability.

To interpret the reference to "for rent" signs to mean *as a matter of law* that rentals were considered and allowed for any duration, including short-term rentals (vacation rentals), is truly extraordinary.

Nonetheless, the reference to rent is in the restriction and because no more is apparent from the restriction itself, deciding whether the parties to the covenants intended anything by it about the duration of rentals will depend on extrinsic evidence. As with other contracts, extrinsic evidence may be admissible to aid in determining the intended meaning of restrictive covenants under *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990), and its progeny. In *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999), the court held that extrinsic evidence may be relevant to determining the intent of restrictive covenants provided that the extrinsic evidence is relevant in giving meaning to the words used in the covenants. In applying the *Berg* principles in this context, just as with other contracts, such evidence cannot include evidence of a party's unilateral or

4

subjective intent, evidence to show intent independent of the written document, or evidence that would alter or contradict what is written. *Id.*[2]

Remand to allow the parties an opportunity to submit extrinsic evidence about what was intended by the language regarding signs and whether it is relevant to duration is necessary before any conclusion can be made about intent to address length of rentals.

When extrinsic evidence is to be considered under the *Berg* line of cases, it is generally for the trier of fact. In *Berg*, 115 Wn.2d at 667, the court adopted *Restatement (Second) of Contracts* § 212 (1981), which provides:

> "(1) The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings *in the light of the circumstances*, in accordance with the rules stated in this Chapter.
> (2) A question of interpretation of an integrated agreement is to be determined by the *trier of fact* if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law."

*Berg*, 115 Wn.2d at 667-68 (emphasis added) (quoting RESTATEMENT § 212).

Whether the trier of fact must make these determinations does *not* require that ambiguity appear on the face of the document. "[A] party may offer extrinsic evidence in a contract dispute to help the fact finder interpret a contract term and determine the contracting parties' intent regardless of whether the contract's terms are ambiguous. Extrinsic evidence is not admissible, however, to show intention independent of the

---

[2] *Berg* addresses parol evidence (extrinsic evidence) used to interpret the meaning of what is actually contained in a contract. *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 32, 959 P.2d 1104 (1998). In contrast, "the 'parol evidence rule' precludes use of parol evidence [(extrinsic evidence)] to add to, subtract from, modify, or contradict the terms of a fully integrated written contract." *Id.*

contract." *Brogan & Anensen, LLC v. Lamphiear*, 165 Wn.2d 773, 775-76, 202 P.3d 960 (2009) (citation omitted) (citing *Berg*, 115 Wn.2d at 667-69; *Hollis*, 137 Wn.2d at 695).

In summary on this issue, I very strongly disagree with the majority's conclusion that the restriction on the size of "for rent" signs *proves* a *conscious decision* to permit rentals of any duration. The sign restrictions do not on their face disclose anything about duration of permitted rentals. If relevant intent is to be found in the restrictive covenants prior to adoption of the ban, it must be found by a trier of fact based on extrinsic evidence.

*Whether the reservation of power in the covenants authorized a majority of the members of the association to adopt a ban on short-term rentals*

The second question is whether the Association had the authority to adopt the ban on short-term rentals by majority vote. At the outset, I do not agree with the Court of Appeals' artificial distinction in *Meresse v. Stelma*, 100 Wn. App. 857, 999 P.2d 1267 (2000), that dictates a difference in reserved authority depending on whether a change in covenants or a new restriction is at issue. This is the ill-advised theory adopted by the majority.

For this theory, *Meresse* relies on *Lakeland Property Owners Ass'n v. Larson*, 121 Ill. App. 3d 805, 459 N.E.2d 1164, 1167, 1169, 77 Ill. Dec. 68 (1984)). *Meresse*, 100 Wn. App. at 859. Referring to *Lakeland Property Owners* and other cases, the Colorado Supreme Court recognized a split in jurisdictions on the matter. *Evergreen Highlands Ass'n v. West*, 73 P.3d 1, 4-7 (Colo. 2003).

6

The relevant language in the covenants here authorizes a majority of the association members to agree "to change these protective restrictions and covenants in whole or in part." CP at 87. Instead of reading this language to mean that the reserved authority extends only to making changes to the existing covenants, the Colorado court said that such a construction "seems illogically narrow." *Evergreen Highlands*, 73 P.3d at 6. The court explained that "from a linguistic standpoint, the *Lakeland* conclusion that 'change or modify' can only apply to the alteration of existing covenants, and not the addition of new and different ones, is not well-founded. Webster defines 'change' as 'to make different.'" *Id.* (quoting *Webster's Third New International Dictionary* 373 (1986)); *see also Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n*, 177 Cal. App. 3d 726, 223 Cal. Rptr. 175, 179 (1986) ("the words 'changed' and 'modified' include any alteration whether involving an increase or decrease") "[C]ovenants could certainly be changed or made different either by the addition, subtraction, or modification of a term." *Evergreen Highlands*, 73 P.3d at 6.[3]

I do not agree with the majority's view that we should treat reservation of power provisions differently depending on whether a change or amendment is made to an existing restriction or is by way of a new restriction. In either case, a modification is made to the covenants, and in the latter case, the modification is to the entire set of restrictions. Moreover, the distinction followed by the majority is flawed because the

---

[3] The Colorado court speculated that the differing outcomes in the cases were actually based on the different factual circumstances and the severity of the consequences presented rather than merely on the distinction between a change to a covenant and creation of a new covenant. *Id.*

7

result can be that a relatively minor new restriction can be precluded if there is no unanimous agreement, while a major change can be made by a simple majority vote.

The important guideline is that the change or addition must be reasonably consistent with the general plan of development, and it should make no difference whether a change is made to an existing restriction or a new restriction is added.

Here, the question is whether the restrictive covenants, as they existed before the ban, permitted a majority of the homeowners to approve a restriction limiting the minimum period for which homeowners may rent their houses in the communities. When covenants reserve power to less than all of the affected homeowners to adopt additional restrictions, then less than all may adopt restrictions provided this power is exercised in a reasonable manner and is consistent with the general plan of development. *E.g.*, *Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc.*, 76 Wn. App. 267, 273-74, 883 P.2d 1387 (1994)). The reason for this rule is that

> [i]n a sense, there is an inherent inconsistency between an elaborate set of restrictive covenants designed to provide for a general scheme or plan of development (generally considered to be for the benefit of the respective grantees), and a clause therein whereby the grantor reserves to itself the power at any time in its sole discretion to change or even arbitrarily abandon any such general scheme or plan of development (a power which is solely for the benefit of the grantor).

*Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So. 2d 665, 666 (Fla. App. 1974), quoted in *Lakemoor Cmty. Club, Inc. v. Swanson*, 24 Wn. App. 10, 15, 600 P.2d 1022 (1979); *see also Shafer*, 76 Wn. App. at 273. Or, to put it another way, the rule ensures that a neighborhood will retain its essential nature and character as

8

originally developed. Homeowners' legitimate expectations based on the covenants governing at the time they acquired their property will in general be protected.

As Justice Gordon McCloud's dissent notes, there may be circumstances where a court may be able to make this determination as a matter of law. But in many cases extrinsic evidence will be available that bears on the matter of whether an amendment to the restrictive covenants is reasonably consistent with the covenants. Under *Berg*'s context rule, such evidence includes "the circumstances leading to the execution of the contract, the subsequent conduct of the parties and the reasonableness of the parties' respective interpretations. *Berg*, [15 Wn.2d] at 667–69." *Shafer*, 76 Wn. App. at 275.

The trial court realized that extrinsic evidence may well be relevant and admissible, but there is no indication that such evidence was considered here. In particular, evidence of surrounding facts may be highly relevant, i.e., in what environment were the restrictive covenants written. Particularly where the propriety of short-term rentals is concerned, the nature and character of the area and of other nearby developments may shed light on what is reasonably consistent with the restrictive covenants and what the property owners could reasonably expect.

If, for example, the development is in an area where short-term rentals are usually allowed in nearby, similar developments because of recreational activity in the vicinity that homeowners can take advantage of by making short-term rentals, it will be less likely that a ban on short-term rentals is reasonably consistent with the restrictive covenants.

The court should acknowledge the possibility that there will be insufficient evidence to draw any conclusions about durational limits in the existing covenants or whether they are reasonably consistent with the existing covenants. If this proves to be the case, then the ban adopted by the Association cannot be given effect because it is in excess of the authority reserved by the covenants.

But at this point, remand for consideration of the question of consistency with the existing covenants, including whether possible extrinsic evidence sheds light on this question, is appropriate as well.

I turn next, briefly, to another concern.

*Whether a ban on short-term rentals is relevant to the restriction that lots must be utilized solely for single family residential use*

Although not my reason for writing separately, I am troubled by the conclusion that because renters for short terms live in, eat in, sleep in, and so on, in the residence, there is no distinction to be drawn between a short-term rental, essentially renting to others for vacation use, and longer-term rentals where renters use the home as their primary residence. Individuals on vacation are not limited by constraints of the same kind as other renters. It seems odd to ignore the fact that many people equate vacations with freedom to act in ways outside their normal conduct. It is to be expected that spirits may be higher and conduct more uninhibited. Noise levels, for example, could well be higher as a consequence. Vacationers might not be as considerate of neighbors and their neighbors' peace and quiet as if they were residents on a more permanent basis. It cannot be gainsaid that some on vacation consume alcoholic beverages to a greater degree than

they ordinarily would, with consequent effects on their behavior. I do not doubt that many of these behaviors occur with residents as well as vacationers, but it seems to be to be putting blinders on to conclude that there is no meaningful distinction relevant to the commercial versus residential uses distinction. Certainly, in any given case, the vacationer may behave in every significant respect like a resident. But over the course of a year, over the course of seasonal changes, there will undoubtedly be a cumulative effect of noise, traffic, and disruption of neighborhoods from successive short-term rentals.

I recognize that many courts have refused to accept the distinction, and without factual, almost scientific evidence, my view is not likely to prevail. Nonetheless, I think it almost disingenuous to act as if rentals for under 30 days are the same as renting to persons who use homes in the communities as their primary residences.

In conclusion, remand should be directed to permit submission of extrinsic evidence on the questions of whether the reference to rent signs in the covenants shows any intent about rental duration and whether the ban on short-term rentals is reasonably consistent with the existing covenants.

For the reasons stated, I dissent.

11

No. 86870-1

Madsen, C.J. (dissenting)

Madsen, C.J.

12

No. 86870-1

GORDON McCLOUD, J. (dissenting)—The original restrictive covenants in this case permitted future amendments by majority vote. The homeowners knew that when they bought in. The original restrictive covenants also limited rental advertising, prohibited nuisances and offensive uses, and barred commercial and nonresidential uses. The homeowners also knew that when they bought in. A majority of the homeowners then voted to amend their covenants to limit short-term rentals.

The question presented by this case is whether the homeowner-majority can do that, or whether this amendment is so inconsistent with the original covenants that the court should require homeowner unanimity to make this change. The majority answers this with a broad legal holding that all rental activity—presumably including hourly rentals—is protected by covenants like the ones at issue here, which certainly contemplated some rental activity but are actually silent on the topic of rental duration. This extremely broad holding ignores the limited and fact-specific

nature of the question presented in this case. Because I would remand for a proper factual inquiry, I respectfully dissent.

1. **The majority's holding is so broad that it prospectively invalidates any limit on the duration of rentals**

Before I address the majority opinion in detail, I pause to note the breadth of the trial court order it affirms. The majority characterizes this dispute as limited to the validity of the 2011 amendment prohibiting rentals of less than 30 days, majority at 5, but in fact, the Wilkinsons sought and obtained four separate rulings from the trial court:

(A)    That the Plan of Development of Chiwawa River Pines (hereinafter "the Plan") for phase 2 and for phases 3-6 each allow residential rentals of any duration - including residential rentals of less than 30 days.

(B)    That specifically the Pope & Talbot Protective Covenants and the 1988 and 1992 Protective Covenants allow residential rentals of any duration - including residential rentals of less than 30 days.

(C)    That a prohibition on commercial uses of lots as expressed by the Protective Covenants as set forth in the Pope & Talbot Covenants for phase [2] and for phases 3-6 and the 1988 and 1992 Covenants described above does not include residential rentals of any duration - including residential rentals for less than 30 days.

(D)    That to the extent that the 2011 Amendment . . . seeks to bar residential rentals of any duration, including those of less than 30 days, it is unenforceable.

2

Clerk's Papers (CP) at 442-43. By affirming the trial court's order in its entirety,

the majority not only invalidates the 2011 amendment barring rentals of less than 30

days, it also prospectively invalidates *any* limit on the duration of rentals in Chiwawa

River Pines.[1]

---

[1] According to the majority, the Association has asked us to consider only part of the trial court's order, and the majority has accordingly limited its opinion consistent with Rule of Appellate Procedure (RAP) 12.1(a), which states that "the appellate court will decide a case only on the basis of issues set forth by the parties in their briefs." *See* majority at 2 n.1. Unfortunately, the majority does not tell us which parts of the trial court's order it has declined to address. This is sure to cause considerable confusion, both as to the meaning of the majority's opinion and as to the purpose and effect of RAP 12.1(a).

The purpose of RAP 12.1(a) is to encourage efficiency and fairness and to give parties a certain degree of control over the theory of their case. To these ends, RAP 12.1(a) prevents an appellate court from finding an error that the parties did not assign. *State v. Hubbard*, 103 Wn.2d 570, 573-74, 693 P.2d 718 (1985). It also prevents appellate courts from deciding legal issues the parties have not argued "[unless] necessary to reach a proper decision." *Harris v. Dep't of Labor & Indus.*, 120 Wn.2d 461, 467-68, 843 P.2d 1056 (1993) (citing *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429-30, 759 P.2d 427 (1988)); *see also* RAP 12.1(b). But RAP 12.1(a) does not require this court to ignore portions of the summary judgment order to which the Association assigned error in this case.

This is so for two reasons. First, as the majority concedes, the Association assigned error to the trial court's *entire* summary judgment order. *See* majority at 2 n.1 (citing Br. of Appellant at 3-4). Having done so, the Association will surely be surprised to learn that the majority has decided not to address every issue in that order. As noted above, the trial court's summary judgment order stated that "to the extent that the 2011 Amendment . . . seeks to bar residential rentals of *any duration*, including those of less than 30 days, it is unenforceable." CP at 443 (emphasis added). Clearly, the Association hoped that this court would recognize its authority to ban rentals of 30 days. I see no indication that it wanted this court, in the event that we upheld the trial court's ruling on the 30-day rental ban, to quietly leave in place the *rest* of the trial court's order banning rental limits of "any duration." *Id.* Certainly, RAP 12.1(a) is not a license to do so.

2. The majority errs in holding that it is manifestly clear as a purely legal matter that the original covenants, which are silent on the topic of rental duration, allow rentals of any duration

As the majority correctly observes, a court's primary objective in interpreting restrictive covenants is to determine the drafter's intent,[2] and if that intent is not clear from the covenants' plain language, then the court may consider extrinsic evidence.[3] According to the majority, however, the language of the covenants makes it "manifestly clear that the drafters [of the Chiwawa River Pines covenants] intended

---

Second, despite the majority's protestations to the contrary, its reasoning *does* affirm the trial court's summary judgment in its entirety. The effect of this reasoning is a blanket prohibition on any amendments to the Chiwawa River Pines covenants that limit rental activity *by duration.* The majority leaves open the possibility that vacation rental activity may be limited in Chiwawa River Pines in other ways—perhaps by a ban on the provision of room service because that is too "commercial" under *Mains Farm Homeowners Ass'n v. Worthington,* 121 Wn.2d 810, 816, 854 P.2d 1072 (1993)—but it absolutely prohibits any purely durational limit.

This is so because the majority's decision turns entirely on the "use" to which the property is put during the rental term. According to the majority, if that use is "'eating, sleeping, and other residential purposes,'" it is permitted "'no matter how short the rental duration.'" Majority at 11 (quoting *Ross v. Bennett,* 148 Wn. App. 40, 51-52, 203 P.3d 383 (2008)). Thus, according to the majority, there is no legal distinction in this case between a 30-day residential rental and a one-night residential rental.

If the majority believes that shorter term bans can be distinguished from bans on 30-day rentals, it should explain how. The Association came to this court assigning error to the trial court's contrary ruling, and this court accepted review.

[2] Majority at 8 (citing *Hollis v. Garwall, Inc.,* 137 Wn.2d 683, 696, 974 P.2d 836 (1999); *Riss v. Angel,* 131 Wn.2d 612, 623, 934 P.2d 669 (1997)).

[3] Majority at 8 (quoting *Hollis,* 137 Wn.2d at 697).

4

to permit vacation rentals." Majority at 11.

I disagree. Instead, those covenants make it manifestly clear that the drafters intended to permit *some* rental activity, but it is not clear what type of rental activity the drafters contemplated—long-term, transient, or both. Because the covenants are ambiguous in this respect, extrinsic evidence is admissible to, in the majority's words, "'illuminate what was written.'" Majority at 8 (quoting *Hollis*, 137 Wn.2d at 697).

Further, because extrinsic evidence is admissible to clarify an ambiguity in a restrictive covenant, the meaning of the ambiguous language is at least in part a question of fact. Some lower courts, however, have erroneously characterized the interpretation of a restrictive covenant as solely a question of law.[4] Both the trial court and the majority made that error here.

In the trial court, the Wilkinsons argued that any amendment "seek[ing] to bar residential rentals of any duration, including those of less than 30 days . . . is unenforceable" under *Ross v. Bennett*, 148 Wn. App. 40, 52, 203 P.3d 383 (2008). CP at 442-43, 466-67. They reasoned that because *Ross* held that "short-term

---

[4] *See Wimberly v. Caravello*, 136 Wn. App. 327, 336, 149 P.3d 402 (2006); *Meresse v. Stelma*, 100 Wn. App. 857, 864, 999 P.2d 1267 (2000); *Parry v. Hewitt*, 68 Wn. App. 664, 668, 847 P.2d 483 (1992). *But see Ross*, 148 Wn. App. at 46.

vacation rentals" were consistent with the residential use covenant at issue in *that case*,[5] short-term rentals must also be consistent with the Chiwawa River Pines covenants, which limit lots to "single family residential use."[6] The trial court agreed, concluding that "there really [we]ren't any facts . . . in dispute, particularly when one reads the *Ross* case" and granted summary judgment for the plaintiffs. Verbatim Report of Proceedings (Dec. 15, 2011) (1 VRP) at 34-35.

The trial court thus treated the meaning of a residential use provision as a question of law and foreclosed any factual inquiry into the intent embodied in the Pope & Talbot and 1988/1992 Chiwawa River Pines covenants. The majority repeats this error by stating that, under *Ross*, "[i]f a vacation renter uses a home 'for the purposes of eating, sleeping, and other residential purposes,' this use is residential, not commercial, no matter how short the rental duration." Majority at 11 (quoting *Ross*, 148 Wn. App. at 51-52).

The majority misapprehends *Ross*'s significance to this case and to the law of restrictive covenants in general. *Ross* was not a broad holding applicable to every

---

[5] The covenants at issue in *Ross* provided that "'[a]ll parcels within said property shall be used for residence purposes only and only one single family residence may be erected on each such parcel.'" *Ross*, 148 Wn. App. at 44. They also authorized "'[a]ny member [to] delegate . . . his right of enjoyment to the common areas and facilities to the members of his family, friends, and tenants.'" *Id.* (first alteration in original).

[6] CP at 85.

6

covenant that distinguishes residential from commercial activity. The *Ross* court

held only that a particular restrictive covenant limiting property use to "residence

purposes only" was consistent with short-term vacation rentals. And it based that

holding on a highly fact-specific record.[7] That record contained a declaration by one

of the covenant's drafters showing that the drafters had "'modeled'" the disputed

covenants on those from a neighboring community where "'vacation rentals'" did

occur. *Ross*, 148 Wn. App. at 47-48. Thus, the *Ross* court did not hold that

restrictive covenants limiting lots to "residential" use are always consistent with

vacation rentals. Rather, the *Ross* court held that a residential use provision is not

so plainly incompatible with vacation rentals that it will override clear evidence that

the drafters *intended* to permit such rentals.

In contrast to the *Ross* court, the trial court in this case had very little

evidence before it regarding the intent embodied in the original Pope & Talbot and

1988/1992 Chiwawa River Pines covenants. The trial court therefore ruled as a

matter of law that short-term vacation rentals are always consistent with residential

and single-family use.

---

[7] Indeed, the *Ross* court acknowledged the factual nature of the question before it, noting that "[w]hile interpretation of the covenant is a question of law, the drafter's intent is a question of fact." *Ross*, 148 Wn. App. at 49.

Had this in fact been the question presented, the trial court's decision might well be correct.[8] But the question before the trial court was different. It was whether the Association could validly limit short-term rentals pursuant to the Pope & Talbot and 1988/1992 restrictive covenants, which prohibited nuisances and offensive uses, banned commercial and nonresidential uses, permitted limited rental signage, restricted lots to "single family" use, and reserved to the Association the power to adopt new land-use restrictions by majority vote. CP at 13, 30. These covenants clearly permit some rental activity, because they allow residents to post signs advertising their properties for rent. They also clearly contemplate restrictions on

---

[8] Both *Ross* and persuasive out-of-state authority indicate that short-term vacation rentals may be consistent with covenants limiting members to "single family" and "residential" use. *See Ross*, 148 Wn. App. at 52; *see, e.g., Slaby v. Mountain River Estates Residential Ass'n*, 100 So. 3d 569, 578-79 (Ala. Civ. App. 2012) (holding that "property is used for 'residential purposes' when those occupying it do so for ordinary living purposes" and therefore "so long as the renters continue to relax, eat, sleep, bathe, and engage in other incidental activities . . . , they are using the cabin for residential purposes"); *Applegate v. Colucci*, 908 N.E.2d 1214, 1220 (Ind. Ct. App. 2009) (holding rental use is residential use because the occupants "use the structures for eating, sleeping, and other typical activities associated with a residence or dwelling place"); *Lowden v. Bosley*, 395 Md. 58, 69, 909 A.2d 261, 267-68 (2006) (holding that "[w]hen property is used for a residence, there simply is no tension between such use and a commercial benefit accruing to someone else"); *Mullin v. Silvercreek Condominium Owner's Ass'n*, 195 S.W.3d 484, 490 (Mo. Ct. App. 2006) ("'The plain and ordinary meaning of 'residential purposes' is 'one in which people reside or dwell, or which they make their homes, as distinguished from one which is used for commercial or business purposes'" (quoting *Blevins v. Barry-Lawrence County Ass'n for Retarded Citizens*, 707 S.W.2d 407, 408 (Mo. 1986)). While we acknowledge this authority, however, we reiterate that the legitimacy of the amendment at issue in this case is a question of fact.

rental advertising, because they limit rental signage to one sign per lot. For the most part, however, these covenants raise questions: what constitutes a nuisance; what constitutes an offensive use; when rentals might conflict with single-family residential usage; and whether there are any specific limits on the majority's power to amend the covenants.

To answer these questions, a court cannot simply rely on a prior appellate court's interpretation of one similar covenant provision in a case with different facts. Rather, the court must consider the disputed covenants in their entirety, along with any extrinsic evidence relevant to their interpretation. The majority refuses to acknowledge the admissibility of any extrinsic evidence at all in this case, because it concludes (apparently as a matter of law) that the drafters of the original and 1988/1992 Chiwawa River Pines covenants "anticipated rentals and *consciously* decided not to limit their duration." Majority at 9 (emphasis added). This constitutes a major departure from precedent.[9]

---

[9] *See, e.g., Ross,* 148 Wn. App. at 50 (permitting extrinsic evidence to clarify the terms "residential" and "residence purposes" in restrictive covenant); *Bauman v. Turpen,* 139 Wn. App. 78, 87-90, 160 P.3d 1050 (2007) (permitting extrinsic evidence to clarify the meaning of the term "one story" in restrictive covenant); *Wimberly,* 136 Wn. App. at at 331, 407 (permitting extrinsic evidence to clarify the phrase "simple, well-proportioned structure"); *Day v. Santorsola,* 118 Wn. App. 746, 755-57, 76 P.3d 1190 (2003) (to determine whether restrictive covenant provision addressed "height" as opposed to "view," the trial court properly considered extrinsic evidence of the way the provision had historically been enforced).

3. Whether the homeowner-majority had the authority to amend the restrictive covenants here is, instead, a question of fact.

For at least a decade, Washington courts have held that where a set of restrictive covenants empowers residents to adopt amendments by majority vote, those amendments are valid only so long as they are adopted "'in a reasonable manner [and are] consistent with the general plan of development.'" Majority at 14 (quoting *Shafer v. Bd. of Trs. of Sandy Hook Yacht Club Estates, Inc.*, 76 Wn. App. 267, 273-74, 883 P.2d 1387 (1994)). Our courts have also recognized that an amendment is unreasonable as a matter of law where it imposes an obligation that differs fundamentally from those contemplated in the original covenants. *Meresse*, 100 Wn. App. at 866-67 (amendment authorizing access road's "relocation" unreasonable where original covenants addressed only "'maintenance, repairs'" and "'additional constructions'" involving said road, and the clause permitting future amendments was limited to certain topics).

In applying these holdings, our cases have never distinguished between amendments that "change" existing covenants and amendments that "create new restrictions." Majority at 14 (emphasis added). But in today's opinion, the majority adopts that distinction as a new rule. This new rule contrasts covenants that permit homeowners to "change" existing covenants with covenants that permit

homeowners to "create new" covenants. Majority at 15 (emphasis omitted).[10]

According to the majority, where a set of restrictive covenants permits a majority of

homeowners to create new covenants, these covenants need have "no relation to

[the] existing covenants." *Id.* By adopting this rule, the majority is able to

distinguish this case from *Shafer*, in which the Court of Appeals found the creation

of an entirely new covenant to be "consistent with the general plan of development."

*Shafer*, 76 Wn. App. at 273. I would not depart from precedent in this manner.

Instead, I would stick with current precedent, which holds that a court

determines whether a restrictive covenant amendment is permissible—that is,

---

[10] The majority cites *Ebel v. Fairwood Park II Homeowners' Ass'n*, 136 Wn. App. 787, 793, 150 P.3d 1163 (2007), and *Meresse*, 100 Wn. App. at 865-66, for this distinction. Majority at 15. The majority's theory is that the court in *Meresse* applied a different—and more restrictive—rule than that articulated in *Shafer*, because the covenants in *Shafer* permitted more radical innovations than does a generic amendment provision. *Id.* at 17. But *Meresse* in fact addresses *Shafer* at length, relying extensively on its reasoning and rule statement and pausing to "add a caveat appropriate to the different facts [at hand]." *Meresse*, 100 Wn. App. at 865. Significantly, that caveat does not distinguish the language of the covenants at issue in *Shafer*. See *id.* at 865-66. Rather, it distinguishes the "nature" of the disputed amendment, i.e., its relation to existing covenants. *Id.* ("In *Shafer*, the existing covenants were extended to a restriction of a similar nature . . . . *Shafer* does not address changes in restrictive covenants that differ in nature from those already in existence.") And in *Ebel*, any seeming distinction between changes and new covenants is dicta. *Ebel*'s reasoning makes clear that it regards *Meresse* and *Shafer* as two cases applying the same rule, according to which an amendment is permissible so long as it is reasonable and consistent with the general plan of development. See *Ebel*, 136 Wn. App. at 793 (citing *Meresse* and *Shafer* for the rule that "an amendment may not create a new covenant that has no relation to the existing covenants"). That is the rule I would apply here.

11

whether it is "'consistent with the general plan of development'"--by looking to "the language of the covenants, their apparent import, *and the surrounding facts.*" *Meresse*, 100 Wn. App. at 865 (emphasis added and omitted) (quoting *Shafer*, 76 Wn. App. at 274). In some cases, a court will be able to ascertain the reasonableness of a disputed amendment as a matter law, without undertaking any factual inquiry.[11] For the reasons outlined above, however, this is not such a case.

In its oral summary judgment ruling, the trial court below acknowledged the factual component of the "reasonable and consistent" inquiry.[12] That court's orders, however, do not reveal any consideration of the facts "surrounding" the drafting of the original Pope & Talbot covenants or their consolidation in 1988/1992. This omission may reflect a need for guidance; unfortunately, the majority provides none.

---

[11] An amendment is unreasonable as a matter of law if, for example, it plainly contradicts language in the original covenants. *See Wright v. Cypress Shores Dev. Co.*, 413 So. 2d 1115, 1118, 1124 (Ala. 1982) ("cancellation of the [residential use] restrictions so as to permit the construction of a convenience store" was "unreasonable exercise of [developer's] authority" to "annul, cancel, modify or amend" restrictive covenants). It is also unreasonable if it differs fundamentally from the obligations described in the original covenants. *Meresse*, 100 Wn. App. at 866-67 (amendment authorizing access road's "relocation" unreasonable where original covenants addressed only "'maintenance, repairs'" and "'additional constructions'" involving said road, and the clause permitting future amendments was limited to certain topics). But where an amendment is not unreasonable as a matter of law, its validity can be determined only in light of "the surrounding facts." *Id.* at 865 (citing *Shafer*, 76 Wn. App. at 271).

[12] *See* 1 VRP at 31-32 ("[I]n assessing what constitutes a reasonable manner consistent with the general plan of development, a court should look to the language of the covenants, their apparent import, and the surrounding facts.").

I would take this opportunity to clarify what "surrounding facts" are relevant to the

"reasonable and consistent" inquiry.

While no Washington case precisely describes the scope of the "surrounding

facts" inquiry, the North Carolina Supreme Court provides a useful guide:

> A disputing party will necessarily argue that an amendment is reasonable if he believes that it benefits him and unreasonable if he believes that it harms him. However, the court may ascertain reasonableness from the language of the original declaration of covenants, deeds, and plats, together with other objective circumstances surrounding the parties' bargain, *including the nature and character of the community*. For example, it may be relevant that a particular geographic area is known for its resort, retirement, or seasonal 'snowbird' population. Thus, it may not be reasonable to retroactively prohibit rentals in a mountain community during ski season or in a beach community during the summer. Similarly, it may not be reasonable to continually raise assessments in a retirement community where residents live primarily on a fixed income. Finally, a homeowners' association cannot unreasonably restrict property rental by implementing a garnishment or 'taking' of rents (which is essentially an assessment); although it may be reasonable to restrict the frequency of rentals to prevent rented property from becoming like a motel.

*Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 559-60, 633 S.E.2d 78

(2006) (emphasis added). This approach rightly focuses on landowners' reasonable

expectations. "The character of the community" necessarily informs these

expectations; it should therefore inform a court's assessment of what is reasonable

13

and consistent with the covenants by which a community's members agreed to abide.[13]

## CONCLUSION

The trial court erred in concluding that the meaning of the disputed covenants in this case was a question of law controlled by prior precedent. The majority makes the same error. This deprives the parties of an opportunity to present evidence on how to interpret the original covenants and how to determine the homeowners' reasonable expectations about how those covenants might be amended. This also substitutes the values of this court's majority for the values of the drafters and homeowners. Instead, I would remand for a proper factual inquiry. I therefore dissent.

---

[13] In light of the need to protect the property owner's legitimate expectations, courts have considered the "character of the community" at the time the property was purchased and whether the covenants were enforced so as to maintain this character over time. *Se. Jurisdictional Admin. Council, Inc. v. Emerson*, 363 N.C. 590, 597-98, 683 S. E. 2d 366 (2009) (considering character of the community "at the time the plaintiff property owners purchased their lots" and noting that this character was maintained "consistently since the first lots were sold"); *Armstrong*, 360 N.C. at 560 (considering the character of the community at the time the plaintiffs purchased their properties).