[No. 3323–2.   Division Two.   August 9, 1979.]

LAKEMOOR COMMUNITY CLUB, INC., ET AL, *Respondents,* v. R. D. SWANSON, ET AL, *Appellants.*

*Ernest L. Meyer,* for appellants.

*Paula Casey,* for respondents.

REED, A.C.J.—Defendants R. D. Swanson and others appeal from the judgment enjoining them from constructing a road linking Lakemoor Divisions 1–5 to certain property located outside of the subdivision. Plaintiff Lakemoor Community Club, Inc., which is a corporation whose members are all owners of Lakemoor lots, cross–appeals from the trial court's refusal to dismiss defendants' counterclaim to establish a private way of necessity *with prejudice.* We affirm.

In September 1966, the Ken Lake Development Company, the dedicator of the five plats known as Lakemoor Divisions 1–5, recorded a document entitled "Protective Covenants and Dedications Applicable To Lakemoor."[1] Among others, this document contained several provisions designed to insure that Lakemoor would remain a self–contained residential community. Article II A of the protective covenants reads, in part: "No lot shall be used for any purpose other than residential." Article VII D provides, in part:

> The general plan for the development of Lakemoor contemplates an integral unit of residences surrounding Ken Lake without breaks in the alignments of the residences and without through traffic streets insofar as is possible, . . . nor shall any lot be used for or dedicated as a street or other public way to areas outside of Lakemoor without the written consent of the dedicator. Such consent shall not be unreasonably withheld by the dedicator . . .

---

[1]After incidents which gave rise to this lawsuit, the residents of Lakemoor amended the covenants to absolutely prohibit the use of a Lakemoor lot as a road. However, as we have determined that the original covenants barred defendants' proposed activities, we need not determine whether the 1976 modifications are effective.

In the summer of 1975, the owners of homes in Lakemoor became aware that Ken Lake was planning to develop a parcel to the north of Division V, tentatively called Lakemoor Division VI. This parcel is apparently "landlocked," being bordered on the north by a limited access highway. Ken Lake ostensibly abandoned its plans after Lakemoor residents expressed their opposition to the project.

On July 2, 1976, Ken Lake conveyed the tract it had intended to develop, plus lots 124, 125, 126 and 135 of Lakemoor V, to defendant Sidco, Inc. (defendant R. D. Swanson served as president and defendant J. Bracy served as vice–president of both Ken Lake and Sidco). In mid–August, Ken Lake granted a "consent" to Sidco, authorizing it to use 25–foot–wide strips of lots 125 and 135 for utilities and as an access route to the northern parcel. This consent was given pursuant to Article VII D of the protective covenants. On August 11, Sidco conveyed the easterly 5.027 acres of the northern parcel to Swanson, Bracy, and the other individual defendants. Thereafter, Sidco and the Swanson–Bracy group filed separate applications for short plats. After construction of a road was started on lot 125, this action was initiated. Plaintiff sought both a temporary and permanent injunction prohibiting defendants from constructing a road across any lot in Division V and from developing the northern parcel as part of the Lakemoor subdivision. The defendants counterclaimed, seeking to have portions of lots 125 and 135 condemned for ways of necessity under RCW 8.24.

Before trial, plaintiff moved to dismiss defendants' counterclaim, alleging that (1) indispensable parties—the individual owners of Lakemoor lots—had not been joined; and (2) the counterclaim failed to state a cause of action. The motion was granted but the trial court specifically ruled that the dismissal was to be without prejudice.

Trial was held in September 1977. The trial court found that Ken Lake had told potential purchasers of Lakemoor lots, both verbally and in brochures, that the full Lakemoor Community would be self–contained, would consist of no

more than 300 lots (the 5 already–platted divisions) and would be protected by a "closed" road system.[2] It further determined that use of a lot as a road is not a "residential purpose" and that the consent provision of Article VII D was

> not intended to permit Ken Lake Development Company to consent to the use of platted lots to provide access to additional commercial or residential developments outside of Lakemoor.

Defendants appeal from judgment granting plaintiff the permanent injunction. On cross appeal, plaintiff challenges the trial court's order dismissing the counterclaim without prejudice.

## ISSUES ON APPEAL

In the recent case of *Rush v. Miller,* 21 Wn. App. 156, 584 P.2d 960 (1978), this court held that a covenant which limits the use of lots in a subdivision to "residential purposes" acts to bar the use of any such lot as a roadway to

---

[2]The trial court's findings in these matters are unchallenged on appeal and are, therefore, accepted as verities. *East v. King County,* 22 Wn. App. 247, 589 P.2d 805 (1978). Finding of fact No. 4 provides:

"From the time of recording the plat of Division I of Lakemoor in 1966 through the first half of 1975, Ken Lake Development Co., Inc., at all times represented to purchasers of Lakemoor lots that the full Lakemoor Community would consist of approximately 300 lots and five divisions, together with designated recreational areas and *a closed road system with a single entrance and exit precluding any through traffic to adjacent areas.* Purchasers were further told the Protective Covenants had been filed *for the protection of lot owners.*" (Italics ours.)

Finding of fact No. 5 reads:

"Purchasers of Lakemoor lots were shown a brochure and a map of the Lakemoor Community both of which refer to the Protective Covenants relating to Lakemoor, illustrate the *closed road system* in Lakemoor and show the extent of the full Lakemoor development. Based upon the sales brochure prepared by the developer and the map used for illustrating the ultimate development of the Lakemoor divisions and the description of the ultimate development by the developer's sales agents, purchasers of lots in the Lakemoor divisions believed that the full Lakemoor development would consist of not over 300 lots and *not over five divisions,* all of which would be served by a *closed road system with a single entrance and exit and without other streets or roadways breaking the alignment of residences to provide access to areas outside of the Lakemoor area.*" (Italics ours.)

serve land lying outside of the subdivision. *See also Thompson v. Squibb,* 183 So. 2d 30 (Fla. Dist. Ct. App. 1966); *Franzle v. Waters,* 18 N.C. App. 371, 197 S.E.2d 15 (1973); *Donald E. Baltz, Inc. v. R.V. Chandler & Co.,* 248 S.C. 484, 151 S.E.2d 441 (1966). Article II A of the protective covenants applicable to Lakemoor contains this very restriction; therefore, defendant can prevail only if it is determined that the restriction imposed in Article II A is radically limited by the "consent" provision of Article VII D. Like the trial court, we are not convinced by defendants' arguments.

The trial court found that the consent provision was inserted at the behest of the City of Olympia and was designed to insure that roads could be built if more through streets were needed to provide adequate emergency services to Lakemoor. As their first line of attack, defendants argue that this specific finding is not supported by substantial evidence. We are inclined to agree. Robert Fristoe, the attorney who drafted the covenants, and defendant Swanson, both stated that the City of Olympia "insisted" that the clause requiring Ken Lake not to unreasonably withhold its consent be inserted into Article VII D. There is no evidence that the "consent provision" itself was drafted to satisfy the city's requirements.

The failure of the trial court's specific finding is not, however, fatal to the trial court's conclusion that the consent provision of Article VII D was not intended to authorize Ken Lake to permit the use of a Lakemoor lot as a roadway for the benefit of the lands lying outside of the subdivision. Our independent review of the entire 1966 document leads us to conclude that the consent provision must be interpreted in light of the general purpose of the various restrictions: to insure that Lakemoor Division 1–5 remain a quiet, self–contained residential community.

It is well settled that a grantor who reserves the right to alter, modify or change restrictive covenants may do so without the consent of the grantees. *See, e.g., Shaddock v.*

*Walters,* 55 N.Y.S.2d 635 (Sup. Ct. 1945); *Gibney v. Stock-dale Corp.,* 20 Del. Ch. 272, 174 A. 117 (1934); *Scott Co. v. Roman Catholic Archbishop,* 83 Ore. 97, 163 P. 88 (1917); 20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* § 269 (1965). *See also* Annot., 4 A.L.R.3d 570 (1965). Although some courts have interpreted this reservation to the grantor as completely negating the grantees' ability to enforce the covenant scheme, others have held that the reservation must be interpreted in such a manner as to give meaning to all of the applicable restrictions and covenants. As stated by the court in *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,* 303 So. 2d 665, 666 (Fla. Dist. Ct. App. 1974),

> In a sense, there is an inherent inconsistency between an elaborate set of restrictive covenants designed to provide for a general scheme or plan of development (generally considered to be for the benefit of the respective grantees), and a clause therein whereby the grantor reserves to itself the power at any time in its sole discretion to change or even arbitrarily abandon any such general scheme or plan of development (a power which is solely for the benefit of the grantor). When such occurs, as it has in this case, rules of construction require that clauses which are apparently inconsistent with or repugnant to each other be given such an interpretation and construction as will reconcile them, if possible.
>
> In the instant case, this can be done by reading into the reservation clause a requirement of reasonableness, . . . We hold, therefore, that the clause in the Declaration of Restrictions, which reserves to the owner "the right to alter, amend, repeal or modify these restrictions at any time in its sole discretion" is a valid clause so long as it is exercised in a reasonable manner as not to destroy the general scheme or plan of development.

(Citation omitted.) *See also Johnson v. Three Bays Properties # 2, Inc.,* 159 So. 2d 924, 4 A.L.R.3d 565 (Fla. Dist. Ct. App. 1964); *Hisey v. Eastminster Presbyterian Church,* 130 Mo. App. 566, 109 S.W. 60 (1908); *Fairfax Community Ass'n v. Boughton,* 70 Ohio L. Abs. 178, 127 N.E.2d 641 (Franklin County C.P. 1955).

The chancery court in the case of *Shields v. Welshire Dev. Co.*, 37 Del. Ch. 439, 144 A.2d 759 (1958) was faced with a situation quite similar to that before this court. In *Shields*, the defendant, assignee of the dedicator of a development, waived a restriction limiting lots to residential use so that it could maintain a "sample home" in the subdivision. The waiver was based on a clause in the covenant agreement which reserved the power to amend or revoke the restrictions to the dedicator. The chancellor, although satisfied that the waiver was a justifiable exercise of defendant's power, stated that an attempt to modify or revoke a protective covenant must be very carefully scrutinized if such modification is for the direct benefit of the dedicator. The dedicator's efforts to exercise its waiver powers in an unreasonable manner or in a manner which indicates its bad faith cannot stand.

Originally, the dedicators sought to incorporate the northern parcel as part of the Lakemoor Community. They wisely abandoned this plan after Lakemoor residents expressed their opposition. Now, after various chameleon-like transformations, these same individuals are again trying to sidestep the clear mandate of the covenants and develop this same parcel without giving current owners even the minimal assurance that the "new" lots will be burdened by the existing covenants. This we cannot condone.

We are satisfied that the "consent provision" of Article VII D was not designed to give the dedicator the power to abrogate the clear purpose of the covenants for its own benefit or for the benefit of its privies. The use of Lakemoor lots for ingress and egress can serve only to benefit defendants' property outside the community. Conversely, lots within the subdivision can only be burdened and rendered less attractive and liveable. The result would be the destruction of the integrity of the Lakemoor Community, as sold to its residents. The owners of Lakemoor lots were convinced that they were buying homes in a self-contained residential community, with a "closed road system." Their

belief was based not only on the existence of the detailed covenant provisions, but also on the *express* representations of defendant Ken Lake through its agents and through its advertising material. To permit Ken Lake to exercise the consent provision in the manner threatened is to elevate defendants' selfish wishes over the justifiable interests and expectations of the individual lot owner. Such a result would be both unreasonable and unconscionable. The trial court clearly did not abuse its discretion in granting the injunction. *Lenhoff v. Birch Bay Real Estate, Inc.*, 22 Wn. App. 70, 587 P.2d 1087 (1978).

## ISSUE ON CROSS APPEAL

Defendants' counterclaim was initiated pursuant to RCW 8.24—Private Ways of Necessity. Upon motion by plaintiff, the trial court dismissed the counterclaim, citing two reasons: (1) failure to serve indispensable parties; and (2) failure of the complaint to state a cause of action. On cross appeal, plaintiff asserts that the trial court erred in not dismissing the actions with prejudice.

■ The failure to serve indispensable parties to a lawsuit, although not jurisdictional, results in the inability of the trial court to render a judgment that affords all interested persons their rights to due process of law. *See* 3A J. Moore, *Federal Practice* ¶¶ 19.01, 19.04 (2d ed. 1978). As stated by the Supreme Court in the nineteenth century decision of *Shields v. Barrow*, 58 U.S. (17 Howe) 130, 139, 15 L. Ed. 158 (1854),

> [Indispensable persons are those] [p]ersons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.

*See also* L. Orland, 3A Wash. Rules Prac. § 19 (2d ed. 1968). *Mayo v. Jones*, 8 Wn. App. 140, 505 P.2d 157 (1972).

It would therefore appear that once the trial court determines that indispensable persons are not parties to the lawsuit it must dismiss the case without making any further

rulings. Under this analysis, the trial court here should not have considered plaintiff's argument that the counterclaim did not state a cause of action and merely should have dismissed the action without prejudice. *Toulouse v. New York Life Ins. Co.*, 39 Wn.2d 439, 235 P.2d 1003 (1951); *Williams v. Poulsbo Rural Tel. Ass'n,* 87 Wn.2d 636, 555 P.2d 1173 (1976) (dismissal for failure to join indispensable parties should generally be without prejudice).

Finally, we have some doubts concerning the propriety of the trial court's analysis of defendants' counterclaim. The trial court found that defendants were attempting to "condemn" their own land and that such is not authorized by RCW 8.24.010.[3] Without resolving the merits of this argument, we wish to point out that it appears that the true issue may be stated as follows: Can RCW 8.24.010 be used to "condemn" the incorporeal covenant rights of other Lakemoor landowners and thus, to free defendants to use their own land without regard to the restrictions of Articles II A and VII D of the 1966 document? *Cf. Southern Cal. Edison Co. v. Bourgerie,* 9 Cal. 3d 169, 507 P.2d 964, 107 Cal. Rptr. 76 (1973). *Duke v. Tracy,* 105 N.J. Super. 442, 252 A.2d 749 (1969); Annot., 4 A.L.R.3d 1137 (1965) (the taking of an incorporeal right is generally compensable under eminent domain statutes). Again we stress that this court is not deciding whether the Washington statute is amenable to defendants' interpretation.

---

[3]RCW 8.24.010 provides in part:

"Condemnation authorized—Private way of necessity defined. An owner, or one entitled to the beneficial use, of land which is so situate with respect to the land of another that it is necessary for its proper use and enjoyment to have and maintain a private way of necessity . . . The term "private way of necessity," as used in this chapter, shall mean and include a right of way on, across, over or through the land of another for means of ingress and egress, and the construction and maintenance thereon of roads, logging roads, flumes, canals, ditches, tunnels, tramways and other structures upon, over and through which timber, stone, minerals or other valuable materials and products may be transported and carried."

Judgment affirmed.

PETRIE and SOULE, JJ., concur.

Reconsideration denied August 29, 1979.

Review denied by Supreme Court December 5, 1979.