
# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| DONALD COLEMAN and SUE WRIGHT, individuals, and THE HAWK HILL ASSOCIATION, a corporation, | ) ) ) ) | No. 38758-5-III |
| Appellants, | ) ) | |
| v. | ) ) | ORDER DENYING MOTION FOR |
| DICK COOK, JOHN CRESS, MARIE EVANS, RAY GOFF, DAVE GULLO, RON HINES, JIM MURPHY, CASSIE SIEGAL, and SCOTT TOWSLEE, individuals, and THE VILLAGES OF GARRISON CREEK MASTER PROPERTY MANAGEMENT ASSOCIATION, a corporation, | ) ) ) ) ) ) ) ) ) ) ) | RECONSIDERATION AND AMENDING OPINION |
| Respondents. | ) | |

The court has considered appellant's motion for reconsideration of this court's opinion dated February 21, 2023, and is of the opinion the motion should be denied.

THEREFORE, IT IS ORDERED that the motion for reconsideration is hereby denied.

THE COURT HEREBY AMENDS the opinion as follows:

The last full sentence on page 8 that states, "On December 8, 2017, the board . . . Phases 3, 4, 9, and 14" shall be amended to read: "

> On December 8, 2017, the board held a special meeting to vote on the exit resolutions for Phases 3, 4, 14, and Myra Road Commercial, LLC property.

Within the last paragraph on page 9, the sentence that begins "Regarding the exit of Phase 9" shall be amended as follows:

Regarding the exit of commercial property owned by Myra Road Commercial, LLC, the president explained that the action would provide clearer boundaries for VGC.

The first full sentence following the block quote on page 10 that begins "The ballots for" shall be amended as follows:

The ballots for the exit resolutions for Phases 3, 14, and the Myra Road Commercial, LLC property contained nearly identical language.

The last full paragraph on page 10 that begins "Eight months later" shall be amended to read:

Eight months later, in September 2018, the amendment memorializing the exits of Phases 3, 4, and Myra Road Commercial, LLC property was properly executed and then recorded by the Walla Walla County Auditor.

The second sentence in the first full paragraph on page 22 that begins "Here, the presence" shall be amended as follows:

Here, the presence of a nursing home, affordable government housing, commercial properties, and undeveloped residential land owned by Mr. Botimer is not integral to the complaining residential phase.

A footnote shall be added at the end of the last sentence of the first full paragraph on page 22 as follows:

These integral aspects have not changed as a result of the exit amendments.[6]
_____
[6] The Phase 14 exit amendment specified the Phase agreed to share its open space and walking trails, share common area expenses, and adopt MPMA's land use standards.

No. 38758-5-III
*Coleman v. Cook*

PANEL:     Judges Lawrence-Berrey, Siddoway, and Staab

FOR THE COURT:

_____
GEORGE FEARING
CHIEF JUDGE

3

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DONALD COLEMAN and SUE WRIGHT, individuals, and THE HAWK HILL ASSOCIATION, a corporation, | ) ) ) ) | No. 38758-5-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| DICK COOK, JOHN CRESS, MARIE EVANS, RAY GOFF, DAVE GULLO, RON HINES, JIM MURPHY, CASSIE SIEGAL, and SCOTT TOWSLEE, individuals, and THE VILLAGES OF GARRISON CREEK MASTER PROPERTY MANAGEMENT ASSOCIATION, a corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

LAWRENCE-BERREY, J. — The Villages of Garrison Creek Master Property

Management Association (MPMA) manages The Villages of Garrison Creek (VGC), a

development comprised of residential and nonresidential "villages" or "phases." For

several years, MPMA dealt with the conflicting interests between the residential and

nonresidential phases. Eventually, the board submitted to the membership the question of

whether the covenants should be amended to allow various phases to exit VGC, that is, to no longer be part of VGC and its governing association. The membership overwhelmingly approved the exit amendments.

Two homeowners and the residential phase where they live brought this lawsuit against MPMA and its board members, primarily seeking to have the covenant amendments declared invalid. The trial court granted MPMA and its board members summary judgment and dismissed the lawsuit. We affirm in part.

We conclude (1) the exit amendments are valid because they complied with the governing documents and the relevant statutes, and (2) the trial court's summary judgment ruling did not consider plaintiffs' various claims for damages, so those claims are reinstated and remanded.

FACTS

VGC is a planned community made up of land located in College Place, Washington. VGC is known for its open spaces and extensive walking trails that follow a creek through well-maintained green spaces. VGC is comprised of different "villages" or "phases," with approximately 240 homes and 400 residents.

An overview of the phases is necessary to understand the dispute:

- Phases 1, 2, 5, 6, 7, 8, and 10 consist of residential properties;

- Phase 3 consists of a nursing home;

- Phase 4 consists of housing units owned and operated by Walla Walla Housing Authority;

- Phase 9 consists of residential lots owned by Pahlisch Homes, and undeveloped commercial property owned by Myra Road Commercial, LLC;

- Phase 10 is a gated residential community, more recently referred to as Hawk Hill Association; and

- Phase 14 consists of 14 acres of undeveloped residential lots, owned by Phase Five Development, LLC, which in turn is owned by Doug Botimer, one of the early developers of VGC.

VGC is managed by MPMA, a Washington nonprofit corporation. Lots within VGC are subject to the "Restated Declaration of Covenants, Conditions, and Restrictions of The Villages of Garrison Creek" (CCRs). Clerk's Papers (CP) at 734.

According to the CCRs, MPMA has no control over the operation or development of the land within Phase 3 or the commercial areas (such as the property owned by Myra Commercial, LLC). Also, Phase 3 and the commercial areas are required to contribute to the expenses and maintenance of any common property, including streets, water and

3

sewer utilities, and walking paths.[1]  Phase 3 and the commercial areas are not responsible

for any dues or assessments for the operation of MPMA, or for the maintenance of

residential or commercial areas, or areas used exclusively by the residents, including park

areas, green belts, etc.[2]

The Walla Walla Housing Authority was one of the first purchasers of VGC land.

There are no common areas that were transferred as part of Phase 4, and the Housing

Authority made its own connections to sewer and water.  Doug Botimer made an oral

agreement with the Housing Authority that it was not required to pay any assessments or

common expenses.  This agreement has always been recognized by MPMA, in that it has

never required Phase 4 to pay assessments or common expenses.

*MPMA governance*

Phase Five Development, LLC, owned by Mr. Botimer, was the original

incorporator or declarant that created MPMA.  MPMA operates pursuant to its "Articles

of Incorporation" and "Bylaws."  Its purpose is to "own, develop, and maintain all

common areas within the [VGC] and to administer, as necessary, the rules and regulations

which pertain to enforcement of the [CCRs] which apply to [VGC] and its residents."

---

[1] We hereafter refer to these charges as "common expenses."

[2] We hereafter refer to these charges as "assessments."

CP at 712. It is tasked with managing the affairs of VGC. To the extent authorized by the covenants, it has the power and duty to make and collect assessments and common expenses against members for the benefit of the homeowners.

MPMA is managed by a board consisting of seven directors. Mr. Botimer, effectively the declarant of MPMA, was entitled to appoint two directors and the other five directors are elected by MPMA members. Mr. Botimer had effective control over the board because the directors he appointed could not be removed without his consent, the board could not be enlarged without his consent, and a quorum could not be established without both declarant-appointed directors present. Mr. Botimer at all times relevant to this case was one of the two declarant-appointed directors.

Anyone who owns a lot within VGC is automatically a member of the MPMA. Each member is entitled to one vote for each lot or living unit owned. The nursing home (Phase 3) was formerly entitled to one vote. According to the covenants, "Membership in the [MPMA], once obtained, will be terminated only by selling or disposing of an ownership interest or property interest covered under the [CCRs]." CP at 726. The actual number of members is determined by the units developed or proposed to be developed at any given time.

*Collection of assessments by MPMA*

MPMA, since its inception, has never collected assessments or common expenses from Phase 3 or Phase 4. With respect to the commercial property owned by Myra Commercial, assessments were originally collected on only part of the lots, but this ceased in 2012.

Donald Coleman was president of MPMA from March 2011 to December 2014. During his tenure, MPMA did not take any action to collect assessments or common expenses beyond those that had been historically collected.

*Amendment of CCRs*

The procedures for amending the covenants are set forth in paragraph 11 of the CCRs:

> Amendments: Any owner may propose amendments to [the CCRs] to the Board of Directors of [MPMA]. The Board of Directors must approve such amendment by a majority vote before such amendment is proposed to the owners, and further provided that the two (2) members of the Board of Directors who are appointed by the Declarant/Owner must have voted in favor of the amendment before it may be submitted to the owners. If the Directors appointed by the Declarant/Owner approve the amendment, together with other Directors who in total represent a majority of the Board, then such amendment shall be presented to the members of [MPMA] for their consideration. The amendment may be submitted for consideration in written form or by the calling of a special meeting. Actual notice must be given to each member before an amendment may be adopted.
> [These CCRs] can be amended only by an affirmative vote of a majority of the Board of Directors, which majority includes both Board

members who have been appointed by the Declarant/Owner and an affirmative vote of owners who hold at least two-thirds (2/3) of all votes in the [MPMA].

Once an amendment has been properly adopted by the owners, it shall become effective when it is executed and certified on behalf of [MPMA], signed by the President thereof, and signed by at least two members of the Architectural Review Committee, and is then recorded with the Auditor of Walla Walla County, Washington. Any amendment which does not meet the criteria established herein shall be null and void.

CP at 744-45. As can be readily seen, Mr. Botimer had veto power over any proposed amendment because his appointed directors were required to vote in favor of any amendment before it could be voted on by MPMA membership.

*Exiting phases*

Since around 2016, Donald Coleman and Sue Wright have sought to exit Phase 10 from VGC. That year, Mr. Botimer told the board that he wanted to be removed as declarant and demanded that several phases be allowed to exit from MPMA and VGC. At the January 2017 board meeting, Mr. Botimer presented a plan to effect his resignation and the exiting of certain phases. He insisted that the MPMA was obligated to respond "yes" or "no" to his proposal to exit Phases 3, 4, 10, and 14 from VGC and MPMA. He suggested that Phase 9 be allowed to exit, but he was less insistent about that phase. If the vote failed, Mr. Botimer threatened to cease development of Phase 14 and continue to participate on the board unwillingly and unmotivated.

7

Regarding Phase 10, Mr. Botimer advised the board to agree to exit the phase because its residents' primary objective was to exit MPMA and take control of the common area maintenance and their own reserve fund. He advised the board that if it failed to negotiate in good faith, Phase 10 residents would "relentlessly continue to deluge" the board with charges of acting outside the authority of the governing documents. CP at 958. If the board agreed, Mr. Botimer advised that it should find the best attorney it could.

*Exit resolutions and amendments*

The board agreed to Mr. Botimer's proposal and hired an attorney to guide it "step by step through the process" for the resolutions, votes, and exits. CP at 1022. Over the course of 2017, the board discussed the exit of each phase.

On December 8, 2017, the board held a special meeting to vote on the exit resolutions for Phases 3, 4, 9, and 14.[3] Mr. Botimer gave the board signed written proxy

---

[3] The board did not vote on an exit resolution for Phase 10. The board and Phase 10 residents had not been able to agree on the terms for how the exiting residents would pay for maintaining the roadway and walking trails the residents used. Donald Coleman and Sue Wright threatened to sue if the board continued to request funding for these items. Negotiations broke down.

MPMA submitted a question to its members, asking whether it should resume Phase 10 negotiations. Almost 75 percent of the membership responded, "yes." CP at 113. Apparently, later negotiations failed because the Phase 10 homeowners brought this suit.

instructions. He instructed the board to count the two declarant-appointed director votes toward quorum and in favor of the exit resolutions. The board did so, then held the meeting open to allow Mr. Botimer's attorney to review the resolutions. The next day, Mr. Botimer affirmed that both declarant-directors approved the resolutions. The board president contacted the remaining directors and confirmed that all seven voted in favor of the resolutions.

On December 10, 2017, MPMA conducted its annual member meeting. All but one director was present at the meeting. At that time, a total of 242 votes were authorized. Of the membership, 99 attended the meeting and voted in person, while 103 voted by proxy.

The meeting minutes indicate that each exit resolution was discussed individually. Regarding Phases 3 and 4, the board president explained that the phases had never paid assessments or common expenses, and that attempts to compel payment would likely fail due to the precedent established. The president also indicated that the exits were necessary to address a threatened lawsuit. Regarding the exit of Phase 9, the president explained that the action would provide clearer boundaries for VGC. Regarding the exit of Phase 14, the president explained that Mr. Botimer wanted to resign from his role as

declarant and a member of MPMA.  Mr. Botimer spoke and urged MPMA members to

support the exit resolutions.

The voting ballot included more specific information for each exit resolution.

The ballot discussing the exit resolution for Phase 4 provided:

> **6) WALLA WALLA HOUSING AUTHORITY EXIT (Phase 4).**
> **Approve the** *Resolution of the Owners of The Villages of Garrison Creek*
> *Master Property Management Association to Approve Exit of Walla*
> *Walla Housing Authority Property* including an **Amendment to the**
> **Restated Declaration of Covenants, Conditions, and Restrictions of The**
> **Villages of Garrison Creek,** having the effect to remove **Walla Walla**
> **Housing Authority property** from the real property encumbered and
> governed by the Declaration and further directing the President of MPMA
> to **execute and record the Amendment** to the Restated Declaration of
> Covenants, Conditions and Restrictions of the Villages of Garrison Creek.
>
>                _____Yes  _____No

CP at 226.  The ballots for the exit resolutions for Phases 3, 9, and 14 contained nearly

identical language.  MPMA members approved each of the four exit resolutions by more

than the two-thirds vote required by the CCRs.

Eight months later, in September 2018, the amendment memorializing the exits of

Phases 3, 4, and 9 was properly executed and then recorded by the Walla Walla County

Auditor.  The document indicated it was approved by a vote in accordance with the CCRs

in December 2017.

Mr. Botimer negotiated a separate agreement and amendment for the exit of

Phase 14, his undeveloped residential property. The amendment included (1) a road

easement and maintenance agreement that specified shared common area expenses,

(2) an open space and walking trail easement agreement allowing MPMA members to

use trails in Phase 14, (3) a waiver of all declarant rights under the CCRs, Articles of

Incorporation, and Bylaws, and (4) a written agreement that the development would adopt

the same land use standards currently used by the MPMA.

*Procedure*

In May 2018, Donald Coleman and Sue Wright filed a derivative lawsuit on behalf

of MPMA against past and current board members Dick Cook, John Cress, Marie Evans,

Ray Goff, Dave Gullo, Ron Hines, Jim Murphy, Cassie Siegel, and Scott Towslee.[4] The

complaint alleged that the individuals, all current or former directors, "are in breach of

their fiduciary responsibilities and duty of loyalty" to MPMA and sought injunctive relief

and monetary damages. CP at 5. The trial court later granted the current and former

board members' motion for partial summary judgment and dismissed the derivative

claims of MPMA.

---

[4] Curiously, Donald Coleman and Sue Wright did not name Mr. Botimer. He, more than any board member, set precedent on how assessments and common expenses would be collected, and he was the architect of the exit proposal.

In December 2019, Donald Coleman, Sue Wright, and Hawk Hill Association (collectively "Coleman") filed a third amended complaint, this time naming MPMA as a defendant, in addition to the current and former board members. Coleman complained that MPMA failed to enforce covenants requiring all phases to contribute to the common property maintenance fund. Coleman also alleged that MPMA illegally exited phases from membership to avoid liability for its failure to abide by the governing documents.

Coleman then moved for partial summary judgment, requesting the court hold the exit amendments void. Coleman argued that the exit amendments were illegal and not adopted in accordance with the CCR's amendment procedure. In an affidavit, Donald Coleman also claimed that MPMA had (1) refused to collect assessments from the exited phases, (2) conspired to favor a developer and illegally transferred funds, (3) conspired to cover up the board's conduct, (4) refused to maintain Phase 10 gates, (5) allocated maintenance expenses inequitably, (6) misused funds, (7) conducted meetings improperly, (8) conspired to deprive the Mr. Botimer of his power, (9) favored the owners of the exited phases, and (10) released the exited phases from land use standards. Mr. Coleman asserted that MPMA's malfeasance caused Phase 10 to incur past and future damages of over $6 million.

MPMA and the board members opposed Coleman's motion. The board members relied on the expert declaration of attorney Scott Miller to support their memorandum in opposition. Mr. Miller was retained to review Coleman's motion. He issued a declaration with his opinion of Coleman's claims. In his declaration, Mr. Miller testified that he is an attorney and arbitrator with experience in common interest community cases. He opined that the exit amendments were lawful and allowed under MPMA's governing documents. He opined that the board thoroughly debated and thoughtfully considered all actions taken, which were ultimately decided by a majority vote. He found no evidence to support Coleman's allegations that the motive for exiting properties was to avoid liability.

Coleman objected to Mr. Miller's declaration and moved to strike it. Coleman argued that Mr. Miller's declaration was a "collection of legal observations and opinions submitted as expert testimony" in violation of ER 702. CP at 531.

At the hearing, the trial court also denied Coleman's motion to strike Mr. Miller's declaration. After argument, the court denied Coleman's motion for partial summary judgment.

*Coleman's second motion for partial summary judgment*

Over one year later, Coleman brought a second motion for partial summary judgment against MPMA and the five board members who were on the board at the time

13

the exit amendments were recorded in 2018 (Cook, Cress, Evans, Murphy, and Towslee).

Coleman again requested the court void the exit amendments. Coleman did not request

partial summary judgment against the four board members who were not on the board at

the time of the exit amendments (Goff, Gullo, Hines, and Siegal).

In his support affidavit, Donald Coleman argued that the exit amendments violated

MPMA's governing documents. Mr. Coleman argued that the five board members

attempted to shield themselves from liability by passing the exit amendments.

Mr. Coleman made no claims about the conduct of the four board members who were not

on the board in 2018.

Coleman's counsel also provided a declaration in support of the motion. The

declaration included excerpts from the CR 30(b)(6) deposition of MPMA where board

member Richard Cook testified on behalf of MPMA. Coleman's counsel questioned Mr.

Cook about the procedure followed for the exit amendments. Mr. Cook testified on

behalf of the MPMA, that

> "[Coleman's Counsel]: Going back to the minutes of the December
> 20, 2017 meeting, which is Exhibit 5, is there anything in Exhibit 5 that
> describes an amendment or a proposed amendment to the bylaws?
> [Mr. Cook]: It was my understanding that the resolutions would give
> permission to the board to finalize negotiations with Botimer. Those were
> between Botimer and his attorney and the association and our attorney.
> And so the actual amendments to the—to the covenants and the bylaws

were—were approved and finally negotiated and approved in, I think, September of 2018.

> [Coleman's Counsel]: Did the membership have anything to do with that approval?

> [Mr. Cook]: It gave permission for that process to happen.

> [Coleman's Counsel]: Did the membership receive any actual notice of those amendments of September 2018?

> [Mr. Cook]: They received the concepts of what those negotiations were going to be about, and they allowed the board to make the final determination."

CP at 632-33. Coleman's counsel characterized this testimony as evidence the exit amendments did not occur when they were voted on by the membership in December 2017, but instead occurred in September 2018. Accordingly, Coleman's counsel argued that members did not receive actual notice of the amendments as required by the CCRs.

*MPMA's cross motion for summary judgment*

MPMA responded with a cross motion for summary judgment. The board members filed a joinder in the motion. MPMA argued that summary judgment should be granted in its favor because:

> a. The MPMA's proposal to allow the exit of certain parcels of land from VGC was overwhelmingly approved by the homeowners in conformity with the governing documents.
>
> b. The MPMA has authority to collect reserves and maintain the common elements of VGC under the governing documents and Washington law.
>
> c. Plaintiffs have come forward with no evidence that the MPMA acted fraudulently, dishonestly, or incompetently with respect to its management of VGC.

15

d.  The Hawk Hill Association is not a member of VGC and does not have standing as a plaintiff in this lawsuit.
e.  Plaintiffs have not pled a cause of action, which would allow them to remove the village of Hawk Hill from VGC.

CP at 1343.

MPMA's motion included the transcript from Mr. Coleman's deposition.  Mr. Coleman testified that Hawk Hill assessed Phase 10 homeowners to pay to fix the gates after MPMA refused.  He was shown a 2005 document, which stated that the "Phase 10 Gating System will be maintained by Phase 10 homeowners."  CP at 757.  He acknowledged seeing the document before but not knowing it to be true because he had not yet bought a home in VGC.  He also stated that when he moved into the community and was elected to the board, he was told that Phase 10 residents maintained the gates.

MPMA's motion also included the transcript of MPMA's CR 30(b)(6) deposition, where Mr. Cook testified.  When questioned about the exit amendments, Mr. Cook responded that MPMA's attorney drafted them and guided the board step by step through the process.  When questioned about the Phase 10 gates, he testified that MPMA did not pay for the gates from the time they were installed around 2006 until around 2016.  He testified that MPMA did provide some money for the gates in around 2016 at the request of Mr. Coleman.  However, he also testified that Mr. Botimer told the board that the gates belonged to Phase 10.

16

The board members again filed Mr. Miller's declaration in support of their motion for summary judgment. Coleman responded with another motion to strike the declaration. The board members opposed the motion to strike and argued the court had already denied Coleman's first motion to strike and requested sanctions.

*Summary judgment hearing*

The trial court held a hearing on the parties' motions for summary judgment. At the hearing, Coleman's counsel opened by explaining:

> There is only one question that need be answered, and all the rest of the issues before this court will fall away. And the question is very simple: Did the members vote on the proposed amendments to the CCRs that were adopted by the board of directors in September 2018?

Rep. of Proc. (RP) at 6. The court agreed that the core issue was the validity of the exit amendments. Following argument on both motions, the court explained its decision and reasoning:

> The Court's review of the record shows that we have volunteers who were following the advice of counsel. The resolutions that were presented to the membership back in December of 2017 showed the members what they were voting on with enough detail for that to be sufficient. The Court believes that the plaintiffs' argument is too technical, that it is reading documents in a vacuum, and is not, therefore, taking into account the governing documents on the whole.
> For those reasons, the Court is going to deny the plaintiffs' motion for partial summary judgment, deny the motion to strike . . . and the Court is also going to grant the defendants' motion for final summary judgment in this matter, as well.

17

> The evidence shows the board acted within the scope of its power and authority. There's no evidence beyond speculation that the board acted for any improper motive. And again, these are volunteers who were attempting to assist the greater good of their community and were doing so relying on legal advice. The question of standing, this—I don't believe needs to be ruled upon, given the fact that the Court is granting the defendants' motion for final summary judgment.

RP at 59-60. Following the hearing the court entered an order in accordance with its oral ruling. Coleman timely appealed.

## ANALYSIS[5]

Coleman contends the trial court erred in summarily dismissing its claims. We note there were two claims. One was whether the exit amendments are valid. The other was whether MPMA and the board members are liable for several allegations of malfeasance. We address the two claims separately.

A.    EXIT AMENDMENTS

Coleman contends that the trial court erred by dismissing its claim that the exit amendments were invalid. We disagree.

We review a trial court's order on a motion for summary judgment de novo.

---

[5] Initially, Coleman raises procedural arguments about whether the board members actually moved for summary judgment by joining and whether MPMA's summary judgment motion was proper, given its failure to file a separate motion pleading. We decline to address these unpreserved procedural claims. RAP 2.5(a).

*Bangerter v. Hat Island Cmty. Ass'n*, 14 Wn. App. 2d 718, 731, 472 P.3d 998 (2020),

*aff'd in part*, 199 Wn.2d 183, 504 P.3d 813 (2022); *Wilkinson v. Chiwawa Cmtys. Ass'n*,

180 Wn.2d 241, 249, 327 P.3d 614 (2014).  A trial court may grant summary judgment if

the evidence, viewed in a light most favorable to the nonmoving party, establishes that

there is no genuine issue of any material fact and that the moving party is entitled to

judgment as a matter of law.  CR 56(c); *Wilkinson*, 180 Wn.2d at 249.  We may affirm the

trial court on any grounds established by the pleadings and supported by the record.

*Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 766, 58 P.3d 276 (2002).

> *1.      MPMA's governing documents permit phases to exit by amendment*

Coleman argues that the governing documents, when read together, do not allow

MPMA to make amendments that exit phases.  We disagree.

Interpretation of covenants is a question of law based on the rules of contract

interpretation.  *Bangerter*, 199 Wn.2d at 189.  The court's primary objective is to

determine the intent of the original parties that established the covenants.  *Riss v. Angel*,

131 Wn.2d 612, 621, 934 P.2d 669 (1997).  In determining intent, language is given its

ordinary and common meaning.  *Id*.  Ambiguity as to the intent of those establishing the

covenants may be resolved by considering evidence of the surrounding circumstances.

*Mountain Park Homeowners Ass'n, Inc. v. Tydings*, 125 Wn.2d 337, 344, 883 P.2d 1383 (1994).

Here, MPMA's Articles of Incorporation grant it broad powers, including "all powers as allowed by law." CP at 726. Coleman does not cite any law that prohibits MPMA from amending the covenants to allow phases to exit. Thus, we conclude that the governing documents allow MPMA to make such amendments to the CCRs.

Coleman argues that the covenants provide the sole method for how membership is terminated. Coleman points to paragraph 5 of the CCRs, which provides that any person who owns or purchases a lot within VGC automatically gains MPMA membership, and that membership "will be terminated only by selling the ownership interest in the lot or unit which created membership rights." CP at 736. However, Coleman's argument assumes that the membership covenant cannot be amended. Any covenant can be amended. And paragraph 11 provides the procedures for doing so.

Coleman next argues that allowing phases to exit results in an increased financial burden on members, which in effect creates a new covenant. This argument is unsupported by citation to authority or logic. Nevertheless, the covenants do not prohibit amendments that create a new covenant.

Coleman next argues that the exit amendments are void because they destroyed the general plan or scheme of VGC as it was intended and sold to residents. We disagree.

A homeowners' association may not amend its governing documents in a way that destroys the general scheme or plan of the development. *Lakemoor Cmty. Club, Inc. v. Swanson*, 24 Wn. App. 10, 600 P.2d 1022 (1979). In *Lakemoor*, a developer sold lots in a closed community with the representation that all lots would be used for residential purposes. *Id*. at 11. The community's covenants had a consent provision that reserved to the developer the right to alter, amend, or modify restrictions at his sole discretion. *Id*. at 14-15. The developer later conveyed lots within the community to a corporation and consented to portions being used for an access road and utilities. *Id*. at 12. Homeowners of the residential lots sued for a permanent injunction to stop the construction of the road, which the trial court granted. *Id*. On appeal, the court examined the consent provision. *Id*. at 14-15. The court held that the provision must be exercised in a reasonable manner that does not destroy the general scheme or plan of the development. *Id*. at 15 (quoting *Flamingo Ranch Ests., Inc. v. Sunshine Ranches Homeowners, Inc.*, 303 So. 2d 665, 666 (Fla. Dist. Ct. App. 1974)). The court ruled the provision did not allow the developer to destroy the integrity of the community as it was sold to residents because the residents were convinced they were buying homes in a self-contained residential community. *Id*. at

16-17. The court explained that it did not condone the developer trying to sidestep the covenants without giving minimal assurance that the new lots would be burdened by the existing covenants. *Id*. at 16.

*Lakemoor* is distinguishable. Here, the presence of a nursing home, affordable government housing, and commercial properties is not integral to the complaining residential phase. Quite the opposite, the general scheme or plan of the complaining residential phase is its gated community surrounded by scenic paths, a waterway, and green areas. These integral aspects have not changed as a result of the exit amendments.

2. *The amendment procedure did not violate the CCRs or Washington law*

Coleman next argues that the board violated the CCRs' amendment procedure. Specifically, Coleman argues (a) the membership did not vote on the specific language of the amendments, (b) no homeowner proposed the amendments, (c) there was no quorum, (d) the board did not use proper communication equipment, (e) the board members used proxies, which are not permitted under Washington law, (f) MPMA violated RCW 58.17.215 by failing to obtain a written agreement from all VGC members allowing alteration of the subdivision, and (g) MPMA violated its duty to act in the best interest of its homeowners. We address each argument separately.

*a. The membership was not required to vote on specific language*

Coleman argues that MPMA membership did not vote on the specific language of the exit amendments. Coleman argues that members voted only on the concepts of the exit amendments at the December 2017 annual meeting, even though the actual amendment language was not decided and recorded until September 2018. We disagree that this approach violated the CCRs' amendment procedure.

The CCRs set out the procedures for amending covenants. In relevant part, they require that any amendment, properly approved by the board, "be presented to the members of [MPMA] for their consideration. The amendment may be submitted for consideration in written form or by the calling of a special meeting. Actual notice must be given to each member before an amendment may be adopted." CP at 744.

Coleman reads "actual notice" to require members to be provided the specific text of the amendments before they can be voted on and recorded. MPMA counters that the ballot language and presentation at the annual meeting was sufficient to provide the membership actual notice of the amendments.

Resolution of this issue turns on the definition of "actual notice," which is undefined in the CCRs. Without a definition of the phrase, our primary objective is to determine the intent of the original parties that established the covenants. *Riss*, 131

23

Wn.2d at 621. Language is given its ordinary and common meaning. *Id*. If the intent of those establishing the covenants is ambiguous, we may consider evidence of the surrounding circumstances. *Mountain Park*, 125 Wn.2d at 344.

MPMA argues that the intent of the original parties that established the covenants can be determined by comparing the original CCRs to the current, restated version, and by looking at the amendment provisions in MPMA's Articles of Incorporation and Bylaws.

MPMA's original CCRs, recorded in 1996, required an amendment to be submitted to the membership at least 60 days before the annual meeting. Notice of the annual meeting was required to include the text of any proposed amendment. It required an affirmative vote of 90 percent of the votes in MPMA and at least 90 percent of all owners for amendments affecting the right to levy dues and assessments or the manner of enforcement of the CCRs.

By contrast, MPMA's current, restated CCRs, recorded in 2002, have no such 60-day submission requirement for amendments. The restated CCRs also do not specify that the "text" of an amendment is required to be presented. This suggests that one of the purposes of the restated CCRs was to liberalize the procedure for amendments.

MPMA further points to its amended Articles of Incorporation, filed in 2003, and its amended Bylaws, filed in 2012, to evidence that the actual text of any amendment

need not be presented to the MPMA membership. Both the Articles of Incorporation and Bylaws specify that written notice of the proposed amendments "or *summary of changes* shall be given to each Member entitled to vote." CP at 720, 730 (emphasis added).

> After considering the parties' arguments, the trial court found that:

> The resolutions that were presented to the membership back in December of 2017 showed the members what they were voting on with enough detail for that to be sufficient. The Court believes that the plaintiffs' argument is too technical, that it is reading the documents in a vacuum, and is not, therefore, taking into account the governing documents on the whole.

RP at 59. We agree with the trial court. The language of the ballots indicated to MPMA members the effect that voting "yes" on the exit resolutions would have. The ballot indicated that a "yes" vote would have the effect of (1) amending the CCRs, (2) removing the phase in question from the real property encumbered and governed by the CCRs, and (3) directing the board president to execute and record the amendment. We conclude that the membership was adequately informed of the purpose of the exit amendments and was not required to approve the specific language eventually used.

### b. *Amendment proposal*

Coleman also argues there was no showing that a homeowner proposed the exit amendments. However, paragraph 11 of the CCRs explicitly provides that "[a]ny owner" may propose amendments. CP at 744. The record shows that Mr. Botimer proposed the

amendments to the board, and introduced and thoroughly discussed them at the board

meeting in January 2017. Mr. Botimer is the owner of undeveloped residential lots within

Phase 14, and therefore is an owner within the meaning of the CCRs. We conclude that

the amendment was properly proposed.

### c. Quorum

Coleman argues there was no quorum present at the board meeting on December 8,

2017, when the exit resolutions were voted on. We disagree.

Article IV, section F of MPMA's Bylaws provides:

Quorum: A majority of Members of the Board shall constitute a quorum,
provided that the Directors appointed by the Declarant are present. . . . The
Board of Directors shall act by a majority vote of those present at its
meeting where a quorum exists.

CP at 715.

Before the meeting, Mr. Botimer provided written proxy instructions to the board,

instructing that he and his appointed declarant-director be counted toward a quorum. The

instructions also indicated how the two declarant-director votes should be cast.

Accordingly, the minutes of the December 8, 2017 meeting where the board approved the

exit resolutions show that a quorum was established with all seven directors present in

person, by proxy, or by telephone. The meeting was held open to allow Mr. Botimer's

attorney to review the exit resolutions. A final vote was taken the next day. Three board

26

members met and confirmed their affirmation and the other four board members were contacted individually by telephone. All seven directors voted in the affirmative. Thus, a quorum of the board was present to approve the exit resolutions.

### d. Telephonic communications equipment

Coleman next argues that MPMA failed to follow the bylaw regarding use of communications equipment. Coleman argues the bylaw requires that telephone conference equipment be used. We disagree.

Article IV, section H of MPMA's Bylaws provides:

Action of Directors by Communications Equipment:  Any action required or which may be taken at a meeting of Directors, or of a committee thereof, *may* be taken by means of a conference telephone call or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time.

CP at 715 (emphasis added). The bylaw does not require MPMA to use telephonic conferencing equipment, but instead allows such equipment to be used.

### e. Director proxies

Coleman next argues that the board's use of proxies is not allowed under Washington law and general corporate law. Coleman cites to the "Washington Nonprofit Handbook" from 2018, but fails to cite to any specific Washington statute that disallows the use of proxies by a nonprofit board of directors.

27

At the time of the exit amendment votes in December 2017, chapter 64.38 RCW governed homeowners' associations (HOA). That chapter had no provisions prohibiting any HOA director from using proxies to vote. *See* former RCW 64.38.025 (2011) through former RCW 64.38.035 (2014).

On July 1, 2018, the "Washington Uniform Common Interest Ownership Act" (WUCIOA), chapter 64.90 RCW, went into effect. RCW 64.90.910. Under the WUCIOA, a HOA director may not vote by proxy. RCW 64.90.445(2)(m). That act and rule applies to all HOAs created after its effective date, but also allows HOAs created before the effective date to amend their CCRs to apply the act's provisions. RCW 64.90.095(1). Here, there is no evidence in the record that MPMA amended the CCRs to opt into WUCIOA; therefore, its provisions do not apply.

Separately, the former Washington Nonprofit Corporation Act, chapter 24.03 RCW, governed nonprofit corporations during the events at issue here. Under that version of the act, there was no prohibition on directors using proxies. *See* former RCW 24.03.120 (2004). The former Washington Nonprofit Corporation Act was repealed in 2021 and replaced with chapter 24.03A RCW. Under the new statute, a director *is* prohibited from using a proxy to count toward quorum or to vote. RCW 24.03A.565(5). Considering the changes in the Washington law to now prohibit

28

use of director proxies, we find that Washington law did not prohibit MPMA directors from voting by proxy at the December 2017 meeting when it approved the exit amendment resolutions at issue.

### f. RCW 58.17.215 does not require written agreement of all members to alter the subdivision

Coleman argues, somewhat unclearly, that MPMA violated RCW 58.17.215. The only specific violation Coleman points to is a requirement in the statute that all alterations to a subdivision be approved by written agreement of all members. By its terms, that requirement applies only if the covenants do not allow the specific alteration. As mentioned previously, the covenants do allow phases to exit the subdivision. The requirement for written approval of all members therefore does not apply.

### g. The members decided that MPMA's proposal was for their benefit

Directing our attention to paragraph 5(c) of the CCRs, Coleman argues that MPMA has a duty to act for the benefit of the homeowners. The provision imposes upon MPMA the "duty to enforce provisions of [the CCRs,] the articles of incorporation, the bylaws, and the rules and regulations of the Association . . . for the benefit of the homeowners." CP at 738. This duty is one of enforcement. It does not apply to proposing covenant amendments to be voted on by the membership. But even if it did,

29

the homeowners decided that the proposal was for their benefit, as reflected in the passage of the exit amendments by more than a two-thirds vote.[6]

3.      *Attorney Miller's declaration*

Coleman argues the trial court erred by not striking attorney Miller's declaration because it contained inadmissible legal conclusions. The board members respond, in part, that this error was not prejudicial because there is no indication the trial court considered the declaration.

As noted previously, we review summary judgment orders de novo. Whether the trial court considered attorney Miller's declaration or not, we certainly did not. For the reasons expressed above, we conclude that the exit amendments were properly presented to the membership in accordance with the covenants and statutory law, were approved by the membership in accordance with the covenants, and are valid.

B.      MPMA AND BOARD MEMBER LIABILITY

In his declaration, Mr. Coleman recounts his many complaints of MPMA and

---

[6] The record suggests that substantially all of the votes were cast by homeowners, rather than Mr. Botimer. At one board meeting, Mr. Botimer told the directors he would cast either 5 votes or 172 votes, the latter reflecting the number of his undeveloped lots. We note there were 173 homeowners who could vote in 2012. Thus, had Mr. Botimer cast 172 votes (instead of 5 votes), the 242 base votes shown in the ballot results would have been substantially higher.

board member malfeasance, including that they failed to enforce the covenants. As previously noted, paragraph 5(c) of the CCRs requires MPMA to enforce the covenants for the benefit of the homeowners.

It is apparent from the trial court's oral ruling, it decided only the question of whether the exit amendments are valid. Nothing in its ruling considered the question of whether MPMA and the board members are liable for Coleman's various allegations of malfeasance. We thus decline to rule on this issue. *See Grundy v. Thurston County*, 155 Wn.2d 1, 8, 117 P.3d 1089 (2005) (an appellate court may decline to consider an issue not ruled on by the trial court). Had the parties in their briefs to this court devoted greater attention to this issue, our decision might be different. *See LK Operating, LLC v. Collection Grp., LLC*, 181 Wn.2d 48, 70-71, 331 P.3d 1147 (2014) (electing to review an issue not ruled on by the trial court because the parties thoroughly briefed and argued it to the lower appellate court).

It may be that MPMA acted for the benefit of the homeowners by *not* suing to force one or more phases to pay assessments and/or common expenses. We note that MPMA's president in 2018 stated his belief that a lawsuit to enforce such payments would be unsuccessful due to several years of MPMA's acquiescence. Also, for Coleman to recover assessments and common expenses not collected by MPMA from nonpaying

phases (likely limited to three years before filing suit), Coleman would need to establish that MPMA would have been successful in forcing nonpaying phases to pay. This could be difficult. Furthermore, Coleman cannot recover these types of damages *after* the nonpaying phases exited because the exit amendments were validly passed for the benefit of the homeowners. As for Coleman's other monetary claims, these may or may not present questions of fact.

C.     LIABILITY STANDARD FOR INDIVIDUAL BOARD MEMBERS

In the interests of judicial economy, an appellate court may consider an issue that is likely to occur following remand if the parties have briefed and argued the issue in detail. *State ex rel. Haskell v. Spokane County Dist. Ct.*, 198 Wn.2d 1, 16, 491 P.3d 119 (2021). Here, the parties have briefed and argued in detail the question of what standard of liability to apply to the individual board members.

Unquestionably, Coleman's allegations against the board members concern their actions taken prior to 2018 within the scope of their role as directors of a nonprofit corporation. Thus, their standard of liability is governed by former RCW 24.03.127 (1986), which sets forth the duties and standards of liability for such directors.

CONCLUSION

We affirm the trial court's summary judgment ruling dismissing Coleman's claims

concerning the exit amendments. The exit amendments are valid.

We remand and reinstate Coleman's malfeasance claims against MPMA and the

board members, except to the extent those claims include damages for nonpaying phases

after they exited.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Siddoway, C.J.                                          Staab, J.